[Crim. No. 3460.   First Dist., Div. One.   Sept. 19, 1958.]

THE PEOPLE, Respondent, v. ARTHUR BARKOFF,
Appellant.

Carlson, Collins, Gordon & Bold, Robert Collins and John Ormasa for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and John S. McInerny, Deputy Attorney General, Francis W. Collins, District Attorney (Contra Costa), and David J. Levy, Deputy District Attorney, for Respondent.

BRAY, J.—On this appeal by defendant from a judgment of conviction after jury verdict, on two counts of violating section 274, Penal Code (abortion), and from denial of his motion for new trial, defendant makes but two contentions: (1) failure of the court to give on its own motion an instruction similar to CALJIC Number 27; (2) alleged error in instructions on intent.

### RECORD

Defendant was charged by indictment with four counts of abortion, each on a different woman. The jury acquitted him on counts II and III. Briefly, the evidence is as follows: For 20 years defendant has been a licensed chiropractor practicing in Richmond. *Count I.* Evangeline testified that believing herself to be pregnant, and directed by a friend, she went to defendant's office, with Joel, a friend. There, defendant instructed her to take off her underpants. He then took her to his treatment room where he requested her to lie on a table. With a speculum he opened up her private parts and inserted a pessary. No mention of Evangeline's menstrual periods was made by either person. While inserting the pessary or immediately thereafter defendant told Evangeline that she could expect her menstrual period to start within one hour to several days; that she would have a heavy vaginal flow which would probably end with cramps and a miscarriage. She paid defendant $35, receiving no receipt. At midnight she began having vaginal flow of blood. Three days later she removed the pessary. The next day she became ill and went to a hospital where some 11 days later she had a miscarriage and expelled a fetus.

*Count II.* Marian determined that she was about three months pregnant. At defendant's office she told him that she "feared being pregnant or becoming pregnant." She did not remember the specific language she used. Defendant told her

he could administer a pessary for prevention, although he did not ask about her menstrual periods or physically examine her. He took her to the treatment room where he inserted a pessary. She paid him $35, receiving no receipt. From that night (Saturday) until Wednesday there was a heavy vaginal flow. She then expelled both the pessary and an 11-inch fetus.

*Count III.* Lee Ila was told she was pregnant after having an appendectomy performed. Her sister took her to defendant. Defendant asked her how many months she had "been gone." Just before inserting a pessary defendant told her not to tell anyone what he was doing because it would incriminate them both. After about seven days the pessary became dislodged. After about another seven days she returned to defendant, who took out the pessary, telling her to return in about a week. On returning he then inserted another pessary, saying "This one will do the job." A couple of weeks later she began to have a vaginal flow and cramps. She was taken to a hospital where she had a miscarriage. Lee Ila's sister paid defendant $35.

*Count IV.* Vernadine, discovering that she was 2 or 3 months pregnant, decided to terminate the pregnancy by getting a "button" to cause a miscarriage. She went to defendant's office and asked him for a "button." When he asked her what she wanted it for, she told him that she might be pregnant as she had missed a couple of menstrual periods. Defendant quoted a price of $35 for a pessary. Not having the money with her she made an appointment for a later date. Returning a few days later, she told defendant that she wanted a pessary as she was pregnant. After she removed her clothing defendant put her on a gurney and inserted the pessary. Defendant told her the pessary should come down in several days, and if nothing happened to return, and that if it became necessary for her to go to the hospital she was to be sure to remove the pessary first. He then used a vibrator on her stomach to start the cramps. She paid defendant $35, asking defendant for a receipt. He refused to give one. Two days later she started to bleed. She entered a hospital where that night she had a miscarriage, expelling a fetus 7 or 8 inches long. It was later determined that the fetus was 4½ or 5 months old. Prior to entering the hospital she had expelled the pessary.

The prosecution produced two other women, the first of whom testified that she had gone to defendant's office, told him she was pregnant and desired the insertion of a pessary. He complied. She returned several days later and he inserted a second pessary. In a few days she had a miscarriage and passed a fetus. The other woman told him that she had missed one of her periods and desired a pessary inserted. He did so. In a few days she passed a few small clots of blood. Each woman paid him $35.

Dr. George Loquvam, physician and pathologist and witness for the prosecution, testified that in his opinion a pessary was not an accepted medical device for contraceptive purposes but was an abortive, as it caused an inflammatory reaction, which will cause an abortion of the very early fetus. The insertion of a pessary into a woman pregnant from 1 to 4 months would cause an abortion. The medical reports on Evangeline, Vernadine and Lee Ila were consistent with the conclusion of criminal abortion. However, he additionally stated that pessaries had been sold as contraceptives and were known among medical men as such, but in his opinion no qualified medical person used them for any purpose as they did not prevent conception.

Defendant admitted inserting the pessaries in all four women. He claimed, however, that he did it for contraceptive purposes only and not to cause miscarriages. None of the women told him that she was pregnant nor did he know that she was. Evangeline told him that she wanted a pessary for birth control purposes so that she could finish school without becoming pregnant. Lee Ila's sister told him that Lee Ila was "playing around" and wanted the pessary for birth control so that she could finish her school. Marian also said she wanted it for birth control and stated that her menses were regular. Vernadine, who was married, told him she wanted it for birth control, that she had two children and her menses were regular. Defendant testified that pessaries had been used by chiropractors and physicians for 25 years as contraceptive devices; that the Chiropractic Board inspectors knew that he was using them for that purpose and had never complained to him regarding their use; that as far as he knew there was no question of his right as a chiropractor to use pessaries as contraceptive devices. Moreover, he did not believe that a pessary could cause a miscarriage in a pregnant woman.

Dr. David Siegman, physician and pathologist and witness

for the defense, testified that pessaries were known to the medical profession as a means of contraception but were not too strongly recommended although they were still being used by older physicians. In his opinion the insertion of a pessary into a pregnant woman would not always produce a miscarriage although there was a good chance of its doing so. From the medical records, he opined that Vernadine's miscarriage was spontaneous, the kind which is seen where there is an accidental abortion. Evangeline's miscarriage resulted from an infection which resulted more likely from another source than the pessary; and Lee Ila was no more than 1½ months pregnant at the time of her miscarriage.

### 1. *Instruction on Circumstantial Evidence.*

Defendant contends the court of its own motion should have given CALJIC Number 27, or a similar instruction, to the effect that to find the defendant guilty on circumstantial evidence alone the proved circumstances must be irreconcilable with any other rational conclusion than that of guilt. The court, at defendant's request, gave CALJIC Number 26, to the effect that if the evidence is susceptible of two constructions it is the duty of the jury to adopt the one favorable to defendant's innocence; if one of the conclusions is reasonable and the other unreasonable, it is the jury's duty to adhere to the reasonable deduction, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt.

In this case, defendant having admitted the acts of inserting the pessaries, the main issue was the intent with which he did it—was it for purposes of abortion as claimed by the prosecution, or for contraceptive purposes, as claimed by defendant? (The court instructed that defendant was authorized to use a pessary "for every lawful purpose upon the persons of the women named in the indictment.")

It seems well settled in this state that an instruction on the irreconcilability of circumstantial evidence must be given, whether requested or not, in any case where the conviction rests substantially on circumstantial evidence. (*People* v. *Bender* (1945), 27 Cal.2d 164 [163 P.2d 8] [conviction for murder]; *People* v. *Yrigoyen* (1955), 45 Cal.2d 46 [286 P.2d 1] [conviction for issuing a check without sufficient funds and with intent to defraud]; *People* v. *Koenig* (1946), 29 Cal. 2d 87 [173 P.2d 1]; [prosecution for robbery]; *People* v.

644

*Candiotto* (1954), 128 Cal.App.2d 347 [275 P.2d 500] [prosecution for possession of narcotics] ; *People* v. *Crisel* (1955), 137 Cal.App.2d 275 [290 P.2d 9] [conviction of second degree burglary] ; *People* v. *Neel* (1957), 151 Cal.App.2d 1 [310 P.2d 986] [conviction of grand theft of an automobile].)

■ The instruction need not be given where the conviction is based principally upon the direct testimony of the victim and the circumstantial evidence is only incidental and corroborative. (*People* v. *Norton* (1956), 141 Cal.App.2d 790, 794 [297 P.2d 439] ; *People* v. *Candiotto, supra,* 128 Cal.App. 2d 347, 357.) CALJIC Number 27, which defendant contends should have been given, itself limits its application to convictions ''on circumstantial evidence *alone.*'' (Emphasis added.) . It is sometimes difficult to determine whether the principal evidence is direct or circumstantial. Let us analyze the evidence in this case. As pointed out before, the real issue was the intent with which the doctor acted.*

■ As to Count I, the jury rejected defendant's version and accepted that of Evangeline to the effect that without inquiry as to her menstrual periods he inserted the pessary and then told her what to expect as a result. His statement that his action would probably result in cramps and a miscarriage was completely inconsistent with his claim that he did not intend to produce that result.

As to Count IV, while defendant denied Vernadine's version of what she told him, the jury believed her testimony that she told defendant that she was pregnant, wanted a pessary for an abortion, and that after inserting the pessary he used a vibrator on her stomach to start the cramps, something which even he would not claim was done to prevent conception.

It seems difficult to reconcile this testimony with any possibility that in view of it defendant could have inserted the pessary for contraceptive purposes only. Still the determination of his intent is made upon the circumstances rather than direct evidence. (See *People* v. *Wales* (1955), 136 Cal. App.2d 846 [289 P.2d 305], and *People* v. *Yokum* (1956), 145 Cal.App.2d 245 [302 P.2d 406].)

While CALJIC Number 27 should have been given, the failure to do so under the circumstances here was not prejudicial. The court did give CALJIC Number 26 which while not as strong as CALJIC Number 27 did require the jury to

---

*Counts II and III need not be discussed, for the acquittals make discussion of possible error as to them moot.

give the defendant the benefit of any reasonable interpretation of the evidence favorable to his innocence. In the second place and more important, the evidence of defendant's guilt, although circumstantial, is overwhelming. It just is not reasonable to expect any reasonable person to believe under the circumstances of this case that defendant, having been told that the women were pregnant, inserted the pessaries for contraceptive purposes. It is inconceivable that had the jury been given CALJIC Number 27 in addition to CALJIC Number 26, any different result would have followed.

In the cases hereinbefore cited holding that an instruction on irreconcilability in circumstantial evidence cases must be given on the court's own motion, no instruction similar to CALJIC Number 26 given here was given, with the exception of *People* v. *Bender* (1945), *supra*, 27 Cal.2d 164, and *People* v. *Koenig* (1946), *supra*, 29 Cal.2d 87. In the Bender case the court gave the first part of CALJIC Number 26 given here, and stated that as a result the jury was not altogether uninstructed as to the law necessary to a proper consideration of the circumstantial evidence and that the failure to give CALJIC Number 27, upon the facts of the case, was not reversible error. The court said that the evidence pointed irresistibly to defendant's guilt. In the Koenig case it was held that the refusal to give CALJIC Number 27, which had been requested by defendant, was not prejudicial error in view of the fact that CALJIC Number 26 was given. Moreover, in *People* v. *Candiotto* (1954), *supra*, 128 Cal.App.2d 347, although the court held that CALJIC Number 27 should have been given, it held the error not to be prejudicial. CALJIC Number 26 was given there but the court does not expressly give any weight to that fact.

In *People* v. *Heuss* (1928), 95 Cal.App. 680 [273 P. 583] [forgery], the Supreme Court in denying a petition for hearing after decision by the District Court of Appeal, Second Appellate District, Division One, stated in effect that an instruction similar to CALJIC Number 27 should have been given but "In view of the state of the record, we do not feel that we would be justified in reversing the case for the error complained of, as the evidence is sufficient in all respects to have warranted the jury in returning its verdict of guilty." (P. 684.)

An examination of the cases in which CALJIC Number 26 was given but the failure to give CALJIC Number 27 was

held prejudicial demonstrates that they were all *cases in which the guilt of the defendant was a close question. In *People* v. *Hatchett*, 63 Cal.App.2d 144 [146 P.2d 469] (conviction of manslaughter) where an instruction similar to CALJIC Number 26 was given, but the one similar to CALJIC Number 27 offered by defendant was refused, the court held prejudicial the failure to give the latter instruction coupled with error in other instructions and the refusal to give other offered instructions on other subjects. However, the court stated (p. 165) : ''. . . we are not basing a reversal upon any single error among those which we have discussed. We regard all of them as substantial, although some are considerably more serious than others.'' It then said that the evidence was not sufficient to clearly establish the defendant's guilt. In this respect and in the facts of the case, there is no similarity to our case.

In *People* v. *Rayol*, 65 Cal.App.2d 462 [150 P.2d 812] (conviction of violation of Pen. Code, § 288a) an instruction similar to CALJIC Number 26 was given but the court refused to give an instruction offered by defendant similar to CALJIC Number 27. This refusal was held prejudicial error, the court saying (pp. 466-467) : ''A portion of the police officers' testimony as to what happened between these parties in the hotel room is such that the jury might reasonably have drawn the inference that the defendant was not a knowing participant in the alleged immoral act, but a mere automaton.''

2. *Instructions on Intent.*

The following general instructions were given on this subject:

''In every crime or public offense there must exist a union, or joint operation, of act and intent. The intent or intention is manifested by the circumstances connected with the offense and the sound mind and discretion of the accused, and I further instruct you that all persons are of sound mind who are neither idiots nor lunatics nor affected with insanity to such an extent as to be unable to discern right from wrong.''

''The word 'wilfully,' when applied to the intent with which an act is done or omitted and as used in my instructions, implies simply a purpose or willingness to commit the act or to make the omission in question. The word does not require in its meaning any intent to violate law, or to injure another, or to acquire any advantage.''

''The word 'knowingly,' as used in my instructions, imports only a knowledge of the existence of the facts in question,

when those facts are such as bring the act or omission within the provision of the law. The word does not require in its meaning any knowledge of the unlawfulness of such act or omission.''

''Where a person voluntarily commits an act which under the law is punishable as a crime, the law implies that the act knowingly done was committed with criminal intent, even though the perpetrator did not know that the act was so punishable.''

''When the evidence shows that a person voluntarily did that which the law forbids and which it declares to be a crime, he has no defense in the fact, if it be a fact, that he did not know that his act was unlawful or that he believed it to be lawful.''

The specific instructions follow:

''Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is guilty of a criminal offense.''

''The provision of the law that 'to constitute the crime of abortion, it is immaterial whether the woman is pregnant or not' does not relieve the prosecution from the duty and burden of proving to a moral certainty and beyond a reasonable doubt that the defendant believed that said women, or any of them, were pregnant.''

''Stated another way, the prosecution must prove the specific intent to procure the miscarriage of said women, or any of them, and no such intent could exist unless the defendant had knowledge or believed that they, or any of them, were pregnant.''

''You are further instructed that the defendant, Dr. Barkoff, was authorized to use for every lawful purpose upon the persons of the women named in the indictment the appliance which has been designated as a pessary.''

''An essential element of the crime of which Arthur Barkoff is accused in the indictment is his intent, the law requiring that to constitute such a crime there must exist a union or joint operation of criminal conduct and specific criminal intent. The law requires that to be guilty of crime one must intend the conduct that fits the description of the crime, and must engage in that conduct knowingly and wilfully.''

■ Plaintiff concedes that as the crime of abortion requires a specific intent the instructions on general criminal intent should not have been given. The authorities support the proposition that where the lawfulness of the act depends upon a specific intent, to instruct upon general as well as specific intent normally would confuse the jury and is error. See *People* v. *Simms* (1956), 144 Cal.App.2d 189 [300 P.2d 898], where on charges of grand theft by false pretenses the trial court in addition to specific instructions gave the instruction on "wilfully" given in our case; *People* v. *Geibel* (1949), 93 Cal.App.2d 147, 177 [208 P.2d 743], where on charges of forgery the court additionally to specific instructions gave the "wilfully" instruction and another instruction on general intent somewhat similar to the one given here; *People* v. *Snyder* (1940), 15 Cal.2d 706 [104 P.2d 639], where in a prosecution for attempted murder the trial court additionally instructed that a person is presumed to intend to do that which he voluntarily did and to intend all the natural and probable consequences of his acts; *People* v. *Maciel* (1925), 71 Cal.App. 213 [234 P. 877], where on a charge of assault with a deadly weapon to commit murder the trial court additionally to specific instructions on intent gave the charge contained in the first paragraph of general instructions hereinbefore set forth. In all these cases the reviewing court held the errors to be prejudicial. In *People* v. *Simms, supra,* 144 Cal.App.2d 189, the defendant was indicted on five counts of grand theft (obtaining money by false pretenses) and convicted on two. The court held the giving of instructions on both specific and general intent, combined with flagrant misconduct of the prosecuting attorney, to be prejudicially erroneous. However, the court pointed out that the case was a close one. The facts of that case and its closeness differentiate it from ours. However, in the following cases similar errors were held not to be prejudicial: *People* v. *Chessman* (1950), 38 Cal.2d 166, 183 [238 P.2d 1001], where on a charge of kidnaping the trial court additionally to specific instructions on intent gave the general instruction that to constitute criminal intent it is merely necessary that a person intend to do an act which, if committed, will constitute a crime; *People* v. *Zerillo* (1950), 36 Cal.2d 222 [223 P.2d 223], in a prosecution for offering a bribe, the trial court additionally gave the above mentioned instruction given in the Chessman case and then added that when a person intentionally does that which the law declares to be a crime, such person is acting with crim-

inal intent even though he may not know that such act is unlawful and even though there be no bad motive—although the case was reversed on other grounds, the reviewing court held that under the circumstances of that case the error in giving this instruction was not prejudicial; *People* v. *Swenson* (1954), 127 Cal.App.2d 658, 665 [274 P.2d 229], and *People* v. *Guasli*, 110 Cal.App.2d 456, 466-467 [243 P.2d 59], where in prosecutions for embezzlement and perjury respectively, instructions similar to the above mentioned one in the Zerillo case were given. In the Swenson case the trial court also gave an instruction similar to the one given here to the effect that it is not a defense to the doing of an act which the law forbids that the person did not know that his act was unlawful or that he believed it to be lawful. The reviewing court pointed out that this instruction is not contradictory of instructions on specific intent as it merely states the general rule that ignorance of the law is no excuse and relates only to defendant's knowledge and not to whether or not he had requisite specific intent.

*People* v. *Richardson* (1911), 161 Cal. 552 [120 P. 20], is somewhat similar to our case. There the defendant was charged with abortion. He admitted giving the victim certain pills at her request. His defense, as is defendant's here, was that he gave them for purposes other than to cause a miscarriage. The trial court instructed additionally to the general instructions on intent that a person is presumed to intend to do that which he voluntarily and wilfully does and must be presumed to intend all the natural, probable and usual consequences of his own acts. The Supreme Court held this instruction to be erroneous but not prejudicial under the circumstances of the case.

While the instructions on general intent should not have been given, it is inconceivable that the jury could have been misled by them. In the first place, believing the prosecution witnesses in counts I and IV as it did, the jury could not escape finding the requisite intent on the part of defendant. Secondly, the instructions stressed the necessity of there being a specific intent. The court defined the crime of abortion as the administering of a substance "with intent thereby to procure the miscarriage. . . ." It charged that the fact it was immaterial whether or not the woman was pregnant did not relieve the prosecution of proving beyond a reasonable doubt that the woman was pregnant, and that the prosecution

must "prove the specific intent to procure the miscarriage" and that "no such intent could exist unless the defendant had knowledge or believed" that there was pregnancy. It then charged that defendant was authorized to use pessaries on the women in question for every lawful purpose. Its final instruction on intent was that an essential element of the crime charged was defendant's intent and that to be guilty he must have engaged knowingly and wilfully in conduct that fitted the description of the crime. It is inconceivable that under the facts of this case, the jury could have convicted defendant without believing Evangeline and Vernadine, and in view of that belief could possibly have found that defendant used the pessaries for any purpose other than that charged, and for what they told him they wanted the pessaries. Thirdly, the jury acquitted defendant on counts II and III. On count II Marian's testimony as to what she told defendant easily could be reconciled with defendant's claim that he was only acting to prevent conception. On count III Lee Ila appeared to be a confused and uncertain witness, and there was medical evidence that possibly she was not pregnant when she came to defendant. On both of these counts the evidence left some doubt as to whether the women told defendant they were pregnant. At any rate, the jury demonstrated in making these acquittals that it understood that the specific instructions on intent prevailed.

Judgment and order affirmed.

Peters, P. J., and St. Clair, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 12, 1958.

---

*Assigned by Chairman of Judicial Council.