[Crim. No. 7431. Second Dist., Div. Three. May 1, 1961.]

THE PEOPLE, Respondent, v. ROSS DUANE JOHNSON, Appellant.

Gordon B. Friesen for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Edmond B. Mamer, Deputy Attorneys General, for Respondent.

VALLÉE, J.—By information defendant was accused in count I of grand theft of an automobile, and in count II of having unlawfully driven and taken the automobile described in count I without consent of, and with intent to deprive, the owner of title to and possession of the vehicle. (Veh. Code, § 10851; formerly § 503.) A jury found him not guilty of the offense charged in count I and guilty of the offense charged in count II. Defendant was sentenced to state prison and an order was make revoking probation granted him in another action. He appeals from the judgment and from the order revoking probation.

The assignments of error are: 1. The court did not adequately instruct on specific intent, an essential element of the

offense denounced by Vehicle Code, section 10851. 2. The court did not make it sufficiently clear to the jury that conviction of the offense charged in count II required a specific intent and that general instructions on intent did not apply. 3. The jury was not adequately instructed on the question of intoxication.

Archie Teague owned a black 1959 Austin-Healey, license SHN 591. About 4 p. m. on May 26, 1960, he parked it at his apartment on Sunset Boulevard in Pacific Palisades. He took the key out of the ignition. The car was in open view to people passing by on Sunset. About 10 a. m. the next morning he returned to the place where he had parked the car. It was not there. He had not given defendant or anyone else permission to take it. He next saw the car shortly before the trial at Milton's Chevrolet, where it had been taken. It was badly damaged. It was not in that condition when he parked it on May 26.

About 1:20 a. m. on May 27, 1960, Earl Maine saw defendant in a late model black Austin-Healey headed south on Pacific Avenue near the intersection of 28th Place in Venice. There was "quite a stream of water" from a broken radiator leading to defendant. There had been an automobile accident five or six blocks away. Maine pulled up alongside defendant and asked him if he was having trouble. Defendant answered, " 'Yes, I have just had an accident, I am trying to park this thing.' "

. Maine drove down Pacific Avenue, turned around, went back, stopped at the intersection of Pacific and 28th Place, and looked down 28th Place. He could hear the engine of the Austin-Healey "being reved up" and "all of a sudden the car started moving rather jerkily into a sandlot, a vacant piece of property on 28th Place." Maine called the police.

After talking to Maine, Officer Jones investigated an accident in which an Austin-Healey was involved at Pacific and Avenue 25. He then went to the vacant lot. As he arrived defendant was walking away from the car. Jones saw that the ignition wires were "hot wired." He asked defendant if he realized he had just had an accident up the street. Defendant replied, " 'Yes, I was just parking the car so I could go back and see what the trouble was.' " Jones asked defendant, "Where did you steal the car?" Defendant replied, " 'Up on Sunset.' " Jones searched defendant and found a bottle of capsules containing benzedrine.

On cross-examination Officer Jones testified: "Q. Now, you said that you had a conversation with the defendant, is that not a fact? A. Yes. Q. Just generally, what was his appearance at the time you talked to him? A. He first appeared to be kind of wobbley on his feet, kind of like he was drunk. Q. His eyes appeared to be watery, red? A. Yes, his eyes were watery, pupils dilated. Q. Did he have any condition of perspiring profusely, being wet? A. Not right then, no. Q. But he did before you arrested him, did he not? A. No. Q. Did you ever observe him sweating or perspiring profusely? A. Just right after we put him in the police car. Q. At that time he started in, is that true? A. That is true. Q. Now, did you smell any alcohol on him? A. No, I did not. Q. Did you come to some conclusion that he was not under the influence of alcohol? A. Yes. Q. Was your opinion, then, that he was not under the influence of alcohol, isn't that true? A. That is true. Q. You didn't determine whether he was under the influence of something else then or not, did you? A. No, not right at the time. Q. Did you determine something like that subsequently? A. Yes. Q. What did you come to a conclusion as to what he was under the influence of? A. When I searched him I found a small glass bottle of capsules, and asked him what they were. He said, 'They are benzedrine,' and I asked him if he had been taking any of them. He said, 'I had about three or four of them this evening.' Q. Did he tell you anything else about that benzedrine? A. No, he said he has been taking them for quite some time. Q. Did he ever tell you he worked at nights and, in other words, to keep awake he would take doctor's prescription of benzedrine? A. No. Q. Did he tell you where he got this specific benzedrine that you saw? A. No."

In the afternoon of May 27, 1960, Officer Walker had a conversation with defendant. Walker asked defendant where he "got" the Austin-Healey in which he was arrested. Defendant said he had been in the Malibu area on Pacific Coast Highway late the previous afternoon; he had had an accident with his car so he walked from Malibu to Pacific Palisades; when he got to Sunset Boulevard in Palisades, he was extremely tired; he saw the Austin-Healey parked on Sunset and walked over to Sunset; there were no keys in the car so he "hot wired" the ignition to start it without a key; he took the car and drove it around the West Los Angeles area for some time; shortly after midnight he went to Venice, where he had an accident.

Defendant testified: He did not sleep the night of May 25, 1960, because he had had to repair his wife's car; he took her to work at 4 a. m., then went to bed and slept until 10 a. m.; he drove to Zuma Beach, sat there for an hour or two resting, then started back; he fell asleep and hit a parked car just north of Malibu police station; the police filled out an accident report and he said he would move his car; he started to walk, slept on the beach for a while, went to a gas station and took about three benzedrine "spansules"; he had been taking benzedrine "off and on" with a doctor's prescription whenever he was working nights; he did janitor work and was working for a chemical company in Hawthorne; the "type of pill" prescribed was different from the ones he took on the 26th; the ones prescribed were to keep him awake; an acquaintance of his had given him the pills he took on the 26th; he had put them in his car at the time, and when he wrecked it he put them in his pocket; he started walking down the highway toward El Segundo; the next thing he remembered was seeing the police officer "on this side street"; he did not know how he got to Venice; he did not remember driving around in a sports car; his wife has an "Austin-Healey Sprite." In testifying, defendant refused to give the name of the acquaintance who he had said gave him the pills.

On cross-examination defendant testified: He did not know whether the pills the doctor prescribed were benzedrine; he knows what "hot wiring" means; he had previously been convicted of "car theft."

In rebuttal Maine testified: He observed defendant at the scene; defendant spoke distinctly; he heard defendant on the stand and paid careful attention to his demeanor and to the manner in which he spoke; defendant's behavior, speech, and enunciation on the stand were very similar to his behavior, speech, and enunciation when he (Maine) saw him immediately following the accident. Officers Jones and Gabe, who arrested defendant, testified to the same effect. On cross-examination Officer Gabe testified further: "Q. Now, Officer Gabe, you were along with Officer Jones when the arrest was made, were you not? A. Yes, I was. Q. And you observed the same things, as far as you know, that he did, isn't that true? A. Yes. Q. You had the same opportunity? A. Yes. Q. Did you observe that this man was wobbley? A. Not necessarily wobbley. Q. Did you observe that he was like he was drunk? A. Not as a drunk person that you would arrest, no. Q. But he had the appearance of one, did he not? A. Of being

drunk? Q. Yes, the symptoms. A. No. Q. He didn't? A. Not completely, no. . . . Q. by MR. FRIESEN [attorney for defendant] : You saw and you were as close to him as Officer Jones, were you not? A. Yes, I was. Q. But you did not see these things? A. No, I didn't." By the district attorney: "Q. Did you give the defendant instructions, sir, as to what to do after you arrested him? A. Yes. Q. And would these—did he follow these instructions, sir? A. Yes, he did."

Section 10851 of the Vehicle Code provides, "Any person who drives or takes a vehicle not his own, without the consent of the owner thereof, and with intent either permanently or temporarily to deprive the owner thereof of his title to or possession of the vehicle, whether with or without intent to steal the same," is guilty of a felony. ■ In order to constitute a felony under this section there must exist a specific intent to deprive the true owner of title to or possession of the vehicle. (*People* v. *One 1951 Ford Sedan,* 122 Cal.App. 2d 680, 687 [265 P.2d 176].)

The court gave a number of instructions on what defendant calls "general intent" to the effect that to constitute criminal intent it is not necessary that there should exist an intent to violate the law or to do a wrong; that criminal intent exists whenever a person intentionally does that which the law declares to be a crime, even though he may not know he is committing a crime or that his act is wrong. These instructions are quoted in the footnote.[1] The court also gave a number of

[1] 1. "In a crime such as that of which the defendant is accused by the information in this case, there must exist a union or joint operation of act and intent." (CALJIC-72.)

2. "To constitute criminal intent it is not necessary that there should exist an intent to violate the law or to do a wrong. Criminal intent exists whenever a person intentionally does that which the law declares to be a crime, even though he may not know that he is committing a crime or that his act is wrong." (CALJIC-72-A.)

3. "The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity. . . ." (CALJIC-73.)

4. "The word 'knowingly', as used in my instructions, imports only a knowledge of the existence of the facts in question, when those facts are such as bring the act or omission within the provision of the law. The word does not require in its meaning any knowledge of the unlawfulness of such act or omission." (CALJIC-76.)

5. "Where a person voluntarily commits an act which under the law is punishable as a crime, the law implies that the act knowingly done was committed with criminal intent, even though the perpetrator did not know that the act was so punishable." (CALJIC-73-A.)

instructions on specific intent. These are quoted in the foot-note.[2]

[2]1. "Any person who drives or takes a vehicle not his own, without the consent of the owner thereof, and with intent to either permanently or temporarily deprive the owner thereof of his title to, or possession of, such vehicle, whether with or without intent to steal the same, is guilty of a felony." (CALJIC-238-A.)

2. "Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.'

"This rule applies to intoxication from any cause (, whether by the use of drugs or otherwise,) when voluntarily produced by the person later charged with crime; and it means that such intoxication, if shown by the evidence to have existed in the defendant when allegedly he committed the (a) crime charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as that (any of those) charged against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal, legal consequences of his conduct." (CALJIC-78-A.)

3. This instruction, numbered 238-B, after defining grand theft and the offense denounced by Vehicle Code, section 10851, formerly section 503, concluded: "The defendant is charged in count 1 of the information with grand theft, and in count 2 with a violation of Vehicle Code, § 503. A necessary element of the crime of grand theft is the existence in the mind of the perpetrator of the specific intent to permanently deprive the owner of his property. Such an intent is not necessary in a violation of Section 503 of the Vehicle Code, an offense which may be committed with intent to either permanently or temporarily deprive the vehicle owner of his title to or possession of such vehicle."

4. "You are reminded that a person might be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime. You do not [at this time] have before you any issue as to defendant's legal sanity." (CALJIC-73-B.) This instruction was given at the request of both the People and defendant.

5. "Some crimes are perpetrated by the intentional doing of an act and there is no necessity of proving the actual intent to commit the crime. Other crimes not only require the necessary criminal i[n]tent but demand proof of a specific intent to do some particular thing. The specific intent which is essential in these cases cannot be presumed from the doing of the unlawful act, but must be proved as a fact.

"Under Penal Code Section 487 (Count I) the crime is committed when a person shall feloniously steal the personal property of another

The instructions were sent into the jury room. After the jury had been out some time, the foreman sent a note to the judge stating the jury did not understand the word "specific" as used in instruction 238-B, which we have numbered 3 in footnote 2. The court then read 238-B and the following took place: "Now, the word 'specific' is bothering you? MR. SWEITZER, JUROR NO. 4: It is bothering us. THE COURT: It seems 'specific' just means that if we left out the word 'specific' it would read this way: 'A necessary element of the crime of grand theft is the existence in the mind of the perpetrator of the intent to permanently deprive——' 'Specific' is just another word to describe that it has got to be exact. In other words, 'specific intent' means the intent to deprive the owner of his property permanently. He has got to have that specific intent. Now, 'specific' is a very simple English word. It means exact. It is a synonym of exact. That is specific intent. Does that clarify it, or would you rather have a dictionary? Do you think it is all right? JUROR NO. 6: Yes. THE COURT: Very well. Now you gave me two instructions. There is no problem with the other instruction, is there? JUROR NO. 4: No, other than the word 'specific' did appear in that. I want to ask that that be sent in. THE COURT: All right, I will read that. Yes, specific is the same thing. Specific intent, same idea is applicable to both instructions. He has got to have the specific intent to deprive the owner of possession of the property, as the instruction says. . . ." The court reread again the last sentence of 238-B.

Defendant contends the court erred in giving instructions on "general intent." He says his "defense was based on the premise that he could not form the *specific intent* required in both Counts I and II because of the effect of the benz*i*drine," and that the instructions were misleading and confusing.

---

such as an automobile, with the specific intent to permanently deprive the owner of the same.

"Under Vehicle Code Section 10851 (Count II) the crime is committed when the taking or driving of the vehicle is accompanied by a lack of consent from the owner and an intent to either permanently or temporarily deprive such owner of his title to or possession of such vehicle;

"The intent is made an affirmative element of these crimes and consequently must be proved as a fact. The proof of intent as a fact is incumbent upon the prosecution and if you find a taking and abandonment of the automobile by the defendant this does not necessarily alone furnish sufficient evidence from which the presence of a specific intent may be inferred by you; however, this intent may be shown circumstantially by the atttending facts surrounding the taking and abandonment of the automobile by the defendant."

■ It was error to give the instructions on so-called "general intent." (*People* v. *Barkoff*, 163 Cal.App.2d 639, 648 [329 P.2d 1005]; *People* v. *Waldron*, 185 Cal.App.2d 43, 45 [7 Cal.Rptr. 916].) The question is: Was the error prejudicial?

■ "The word 'specific' (adjective) means 'Precisely formulated or restricted; definite, . . . explicit; of an exact or particular nature. . . .'" (*People* v. *Thomas*, 25 Cal.2d 880, 898 [156 P.2d 7].)

■ In view of what took place when the jury returned to the courtroom for instruction as to what was meant by "specific," it is not reasonably probable that the instructions on general intent caused the jury to misunderstand the instruction as to specific intent to either permanently or temporarily deprive the owner of title to or possession of the automobile. The jury's attention was focused on instruction 238-B which definitely told them defendant had to have the specific intent "to either permanently or temporarily deprive the vehicle owner of his title to or possession of such vehicle." The judge told the jury specific intent was applicable to this part of the instructions and that defendant had to have "the specific intent to deprive the owner of possession of the property." And he told the jury that "specific" means "exact," the dictionary definition.

We think the statements of the court clarified any uncertainty in the minds of the jurors with respect to specific intent. It is not reasonably probable that after what occurred on the return of the jury for further instructions the instructions on "general intent" caused them to misunderstand the instructions on specific intent. We do not think it can be said to have been probable that a different result would have followed had the "general intent" instructions not been given. The subject of intoxication was adequately covered in the instructions given.

In passing, we should say we think the language in 238-B, "Such an intent is not necessary in a violation of section 503 of the Vehicle Code, an offense which may be committed with intent to either permanently or temporarily deprive the vehicle owner of his title to or possession of such vehicle," which follows immediately after the words to the effect that a necessary element of grand theft is a specific intent, may be misleading to a layman. Without the emphasis placed on specific intent such as given by the trial judge in the present case, a layman might readily get the impression that a specific

intent is not a necessary element of the offense denounced by Vehicle Code, section 10851. The instruction should be revised.

 Defendant, by number only, requested and the court refused to give the instruction quoted in the footnote.[3] The blank spaces were not filled in. The instruction, as requested, was unintelligible. A trial judge is not required to correct a requested instruction that is incomplete. (*Smith* v. *Sugich Co.*, 179 Cal.App.2d 299, 308 [3 Cal.Rptr. 718].) Furthermore, the subject matter was covered by the instructions given. The court did not err in refusing to give this instruction.

Nothing is said in defendant's brief with respect to the appeal from the order revoking probation. We consider that appeal abandoned.

Judgment and order revoking probation affirmed.

Shinn, P. J., and Ford, J., concurred.

---

[3]"In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed.

"Thus in the crime of ...................., a necessary element is the existence in the mind of the perpetrator of the specific intent to ............................................................ .................................................... and unless such intent so exists that crime is not committed." (CALJIC-72-B.)