[Crim. No. 14340. Fourth Dist., Div. Two. Aug. 31, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER STEPHEN SCOTT, Defendant and Appellant.

824

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Rosendo Pena, Jr., Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Keith I. Motley and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, J.**—Defendant Walter Stephen Scott appeals from a judgment of conviction of two counts of attempted unlawful driving or taking of a vehicle (Pen. Code, § 664, Veh. Code, § 10851).

By information defendant was charged with one count of attempted robbery and two counts of attempted unlawful driving or taking of a vehicle. He pleaded not guilty and not guilty by reason of insanity to all counts, waived jury trial and stipulated to trial by the court as to both guilt and sanity. It was also stipulated that on the issue of guilt the court should consider the testimony given at the preliminary hearing.

The charge of attempted robbery was eventually dismissed pursuant to Penal Code section 1118.1 but the court found defendant guilty of the two counts of attempted unlawful taking of a vehicle. Pursuant to an agreement between the parties the court suspended further proceedings on the issue of sanity and granted defendant summary probation for a period of three years, whereupon defendant withdrew his plea of not guilty by reason of insanity. This appeal follows.

The principal issue is whether the evidence supports the court's finding that defendant had the requisite mens rea, i.e., the specific intent to temporarily deprive the owners of their vehicles, notwithstanding his apparent involuntary intoxication and resulting delusional state at the time he committed the acts leading to his conviction.

Testimony presented at the preliminary hearing and at trial revealed the following facts.

On the evening of August 1, 1981, defendant, accompanied by his brother Charles Scott, attended a family reunion-type party. The brother noticed a large punch bowl filled with red punch and saw the punch bowl refilled several times during the course of the party. He also observed defendant drinking some of the punch.

At some point in the evening the supply of ice ran low and the brother volunteered to go to the store to get more. When he left, everyone, including defendant, appeared to be behaving normally. However, when he returned the brother noticed that the behavior of the party guests had changed dramatically. He began looking for defendant and while doing so he noticed a number of guests holding cups of punch behaving strangely and in some cases bizarrely. One man, pointing to the floor, stated there was a dog in the room. Several people holding glasses of punch in their hands were vomiting. When the brother finally located defendant, he noticed that defendant's eyes were unusually large and dilated, and that defendant appeared uncoordinated. Defendant also appeared not to recognize his brother. Feeling that something was wrong, the brother took defendant by the hand and led him out of the house and into his car.

On the way home defendant told his brother he could see a big fireball in the sky and that he could see the brother and his in-laws in the flames. Defendant described it as "Hell" and he stated either that they were trying to pull him in there or he was trying to pull them out. At some point during the ride home, defendant stuck his head out of the car window and stated that he felt "good enough to fly home." The brother, who had received

some instruction on drug intoxication and had also previously seen people who were on PCP (phencyclidine), believed defendant might be on PCP.

The morning after the party the brother called defendant; defendant sounded as if he were back to normal. Defendant indicated he did not remember what he had done the evening before.

Eleanor Michele Sutton was also present at the party. She testified that during the first hour after she arrived she did not notice anything unusual. She did notice a punch bowl on a table and observed a woman refilling the bowl with punch. Approximately 15 or 20 minutes after the bowl was refilled, Sutton observed that some of the people that were dancing were falling on the floor and a few were throwing up. She noticed defendant, whom she had never met before, with a cup of punch in his hand, talking about the Bible and stating that the world was coming to an end. Sutton herself did not drink anything at the party.

During an interview with Dr. Robert Summerour, a forensic psychiatrist, defendant stated that at some point during the party he began to see intense colors and heard helicopters and loud sirens. He stated that his body was clumsy, he was sweating, had difficulty talking, and felt as if his heart was beating rapidly. Defendant remembered being led away from the party and into a car by his brother and also his attempt to jump out of the car window during the ride home. Defendant could not remember what occurred after he arrived home, although he did remember preaching about the Bible and the world coming to an end.

Defendant further told Dr. Summerour that the next day he felt a little more hyperactive than usual but attended church with his family and proceeded through the day without incident. However, when he awakened on Monday morning, August 3, 1981, he felt queasy and decided not to go to work. After taking his children to school, defendant took his mother-in-law, Frances Nichols, with him to purchase some glass to replace broken windows at his house. While inside the store, defendant began to feel the same feelings he had at the party. The clerk "spooked" him because he (the clerk) "looked like he was from Mars." Defendant ran out of the store and into his car, and then imagined he observed a long funeral go by in which he sensed that he was the deceased. Defendant began to drive on the freeway at a high speed.

Defendant made similar statements to two other psychiatrists, Dr. Flanagan and Dr. Oshrin.

In testifying as to the basis for his opinion Dr. Summerour reported that Ms. Nichols related to him that on the return glass-purchase trip defendant

drove past her house without stopping, stating that he was driving to Bakersfield to talk with his mother. Ms. Nichols observed defendant looking over his shoulder frequently, driving fast and making rapid lane changes. While on the freeway defendant stated to Ms. Nichols the CIA was after him and was following him in an airplane because he was a secret agent. He said he had to get to the police for help. He started calling Ms. Nichols "Baby," an affectionate term that he usually addressed to his wife. Defendant was sweating profusely and repeatedly stated that he was thirsty. Ms. Nichols observed that defendant's eyes were "glassy and weird," that he was talking fast and that he did not seem to be making sense. Finally, when the car overheated and stopped running, defendant jumped out of the car and ran up the offramp. Ms. Nichols eventually lost sight of him.

About this time, 13-year-old Robert Briggs was sitting on his motor bike in the driveway of a gas station in Riverside County. Defendant approached him, stated he was a secret agent and demanded the boy give him the motor bike. When Robert refused, defendant hit him on the helmet, knocking him off the bike, and then proceeded to mount the bike. Defendant attempted to kick-start the cycle, but was unsuccessful.

Douglas Bushlen was driving his pickup truck toward the highway 91 onramp when he observed a man knock a kid off a motor bike at a Shell service station. He then observed other people trying to get the man off the bike and decided to drive into the service station and offer assistance. The man, defendant, then ran toward Bushlen's stopped truck and jumped on the back of it. Defendant told Bushlen to drive on, that he was from the FBI and the CIA. Bushlen then drove to and parked at the Magnolia Lumber Yard; a few minutes later defendant got off the truck.

Bushlen testified that defendant seemed "kind of crazy" and appeared restless and hyperactive. He also appeared frightened and stated in a loud voice that the President of the United States and he had fallen out of an airplane. He appeared to be under the influence of something and did not seem to know who or where he was.

Christopher Bell was operating a forklift at the Magnolia Lumber Yard when defendant arrived in the back of Bushlen's pickup truck. Bell observed defendant banging on the side of the truck stating that he was with the secret police and that he wanted to get inside the truck. At some point defendant got off the truck, walked toward Bell and pointed toward the freeway, stating that the President was going by. Bell stopped the forklift and got off. Defendant then jumped on top of the forklift and tried to start it, declaring that he needed the forklift for police business. Bell removed the key from the ignition and told defendant he could use the telephone inside the store

to call the police. According to Bell defendant was speaking in a loud voice and was perspiring profusely.

Once inside the building, defendant called Information in an attempt to get in touch with Washington, D.C., stating that he was "John Shaft" and that he was from the CIA. When the call failed to go through, defendant hung up and re-dialed the operator. This time he asked for the police and stated that "they" were trying to "kill the President." He stated either that he or the President had fallen out of an airplane.

Defendant then hung up the phone, ran out of the building, jumped into a nearby truck and tried to start it. The truck's owner, Cecil Endeman, followed close behind. Endeman's stepson was sitting in the passenger seat when defendant jumped inside, closed the door and asked, "How do you start this vehicle?" Defendant then announced in a loud voice, "I'm with the CIA and I need to use the car." Endeman demanded that defendant get out of the car, at which point defendant ran back inside the building.

Defendant then telephoned his mother, stating: "I don't know where I'm at but tell somebody to come get me." He then asked the owner of the lumber yard to call the police. Defendant asked for everyone's names and addresses, indicating that he needed them for his "report." He appeared restless and frightened to those who were present.

After delivering defendant to the lumber yard, Douglas Bushlen had returned to the Shell service station and contacted police. Police Officer Dennis Wensel followed Bushlen back to Magnolia Lumber where Bushlen pointed defendant out. Wensel handcuffed defendant and placed him in the squad car. While in the squad car, defendant screamed that he was innocent, that he was a CIA agent and had credentials. At some point defendant began thrusting his feet against the car door. Wensel eventually placed additional restraints on him. Defendant repeatedly demanded that he be released immediately. He continued to scream for about 45 minutes; however, he later appeared quite calm at the booking interview.

### Discussion

Defendant contends the trial court erred in finding he had the specific intent to deprive the victims of their vehicles. He argues the court's finding of specific intent was based on a misconception of the law of diminished capacity and that the evidence is insufficient to support a finding of specific intent.

Section 10851 of the Vehicle Code provides in part: "Any person who drives or takes a vehicle not his own, without the consent of the owner

thereof, and with intent either permanently or temporarily to deprive the owner thereof of his title to or possession of the vehicle, whether with or without intent to steal the same, . . . is guilty of a public offense . . . ." Conviction under this section requires a finding that the accused had the specific intent to deprive the owner of title to or possession of his vehicle. (*People* v. *Johnson* (1961) 191 Cal.App.2d 694, 699 [13 Cal.Rptr. 1]; *People* v. *Warren* (1959) 175 Cal.App.2d 233, 239 [346 P.2d 64]; *In re Robert V.* (1982) 132 Cal.App.3d 815, 821 [183 Cal.Rptr. 698].)

 At trial, to negate the specific intent requirement of section 10851, defendant asserted a defense of diminished capacity resulting from involuntary intoxication. He presented the testimony of several witnesses who stated in essence that at the time of the commission of the alleged offenses defendant was acting irrationally and in a bizarre manner and appeared to be under the influence of something. Defendant also introduced the testimony of three psychiatrists who all stated that, in their opinions, at the time of the incident defendant did not have the mental capacity to form the specific intent to deprive the owners of their vehicles, either temporarily or permanently.[1] The court nevertheless found defendant did have the specific

---

[1] Dr. Robert B. Summerour stated: "Well, I believe that his [defendant's] mental condition would prevent him from being able to have the mental capacity to form the intent to personally deprive. . . . [¶] During a delirium—during his delirium, I believe that he had delusions. He believed that his life was in danger, that—no matter how strange it seemed to those observing him, he believed that he was being followed by the CIA and that people were dropping out of airplanes and that he was going to be killed and his mother was going to be harmed and he had to warn her. He was seeing things that he didn't ordinarily see that were frightening to him, like a ball·of fire in the sky with people's faces in it or seeing his own funeral. Those events seemed real to him, but they were not real. They were false perceptions because of his deluded mental state.

"Of course, his judgment was impaired because he had to make decisions about how to proceed based upon such distorted information. . . . [¶] And since he believed he was a secret agent and that he was involved with the CIA . . ., I don't think he could even have a reasonable understanding about what his responsibilities were to the law. I don't think he could think clearly about what was legal and what was illegal in terms of a course of action.

"So I think that his mental capacity was severely impaired; and, therefore, he did not have the ability to form a specific intent to deprive another of their property. [¶] I think all he was doing was—what he was doing was primarily reacting in a frightful way, in a confused animated way to his distorted perceptions of what was happening to him."

Likewise, Dr. Robert Flanagan, an expert in forensic psychiatry, testified: "From all indication I have, the man was suffering from an altered mental condition at that time. I felt that he was not in contact with reality. His reality—testing was severely impaired. I think that his judgment was badly impaired at that time. [¶] There were a lot of other—there's agitation occurring at that time. There was fear or panic he described to me as recalling having gone through.

"I think all of these things would have had an influence on his ability to form a specific intent, and for that reason I don't feel that he did have the ability to form this intent."

Dr. Harvey Oshrin, also a forensic psychiatrist, testified in part: "In my opinion on that day Mr. Scott *was* basically a non-mentally ill person either from a functional or organic point of view who apparently was intoxicated with some kind of chemical, said to be PCP, and as such was suffering from the effects, or after effects, of intoxication. . . . [¶] I felt he did not have the mental capacity to perform the specific intent to commit a robbery or to deprive the owners of their vehicles."

intent to temporarily deprive the owners of possession of their vehicles, giving two reasons for its finding. First, the court stated that although defendant's judgment and rationality may have been impaired, his capacity to form intent was not. Second, the trial court reasoned that in light of the Supreme Court's decision in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], the viability of the doctrine of diminished capacity in the guilt phase is questionable and that the testimony given by the psychiatrists would probably have been more appropriate in the sanity phase of the trial.

We find it unnecessary to discuss either of these propositions. The evidence establishes that defendant unknowingly and therefore involuntarily ingested some kind of hallucinogen which caused him to act in a bizarre and irrational manner and that, acting under the delusion that he was a secret agent and that he was acting to save his own life or possibly that of the President, defendant attempted to "take" vehicles belonging to others without their consent. The only question is whether or not a crime has been committed. Under the circumstances we believe not.

Subdivision Three (formerly subd. Four) of Penal Code section 26 includes among persons incapable of committing a crime, "Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent." It is clear that in attempting to commandeer the vehicles defendant acted under a mistake of fact: he thought he was a secret government agent acting to protect his own life or possibly that of the President. ■ When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. (*People* v. *Osborne* (1978) 77 Cal.App.3d 472, 479 [143 Cal.Rptr. 582].) ■ If in fact defendant were a government agent and either his life or the life of the President were in danger and defendant attempted to commandeer the vehicles for the purpose of saving his own life or that of the President, his actions would have been legally justified under the doctrine of necessity. (Cf. *People* v. *Patrick* (1981) 126 Cal.App.3d 952, 960 [179 Cal.Rptr. 276]; Rest.2d Torts, §§ 262,[2] 263;[3] also cf. Comment, *Necessity Defined: A New Role in the Criminal Defense System* (1981) 29 UCLA L.Rev. 409, 410-413.)

---

[2]Section 262 reads: "One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if the act is or is reasonably believed to be necessary for the purpose of avoiding a public disaster."

[3]Section 263 reads: "(1) One is privileged to commit an act which would otherwise be a trespass to the chattel of another or a conversion of it, if it is or is reasonably believed to be reasonable and necessary to protect the person or property of the actor, the other or a third person from serious harm, unless the actor knows that the person for whose benefit he acts is unwilling that he shall do so. (2) Where the act is for the benefit of the actor or a third person, he is subject to liability for any harm caused by the exercise of the privilege."

Penal Code section 26 does not expressly require that the vitiating mistake be reasonable, but we may assume for purposes of this decision that it must. (See Civ. Code, § 1577; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377-378 [303 P.2d 721].) Although defendant's mistake of fact was undoubtedly irrational, it was also undoubtedly reasonable under the circumstances, because the circumstances include that the mistake emanated from a delusion caused by defendant's involuntary intoxication resulting from unknowingly ingesting some unspecified hallucinogenic substance.[4]

We conclude therefore that even if the evidence is sufficient to support the trial court's finding that defendant intended to temporarily deprive the owners of possession of their vehicles, defendant's actions clearly fall within the purview of Penal Code section 26, subdivision Three, and were therefore not criminal.[5]

■ The Attorney General argues that the theory of mistake should not be considered by us. First, it is asserted that the theory of mistake was not advanced in the trial court, that defendant advanced only the defense of diminished capacity and when it was rejected waived his insanity defense in consideration of an agreement that he would receive summary probation. Second, and overlapping the first, it is urged that the theory of mistake has not been tried. We conclude the question of mistake is properly before us.

It is true, of course, that at the conclusion of the guilt phase of the trial after the court indicated it would find defendant guilty, defendant waived his insanity defense in consideration of an agreement that he would receive summary probation. However, the defense of mistake was properly part of the guilt phase of the trial, not the sanity phase. Thus, defendant's waiver of his insanity defense is immaterial to the question of whether the issue of mistake may properly be considered on appeal.

The assertion that the theory of mistake was not advanced in the trial court is accurate, but in a substantive sense it is not accurate to say that the

---

[4]Had defendant's delusions resulted from voluntary intoxication, his mistake of fact could not be considered reasonable. (Cf. Pen. Code, § 22 [which provides in part: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. . . ."].)

[5]It is quite possible that subdivision Five of Penal Code section 26 would also be applicable, rendering defendant's conduct noncriminal. Subdivision Five, formerly subdivision Six, of Penal Code section 26, includes among those persons incapable of committing a crime, "Persons who committed the act or made the omission charged through misfortune or accident, when it appears that there was no evil design, intention, or culpable negligence." In view of defendant's involuntary intoxication and resulting delusions it might fairly be said defendant's attempts to commandeer vehicles resulted from "misfortune or accident." (Cf. *People* v. *Acosta* (1955) 45 Cal.2d 538, 543-544 [290 P.2d 1]; *Somers* v. *Superior Court* (1973) 32 Cal.App.3d 961, 969-970 [108 Cal.Rptr. 630].)

issue of mistake was not tried. Defendant pled not guilty and the entire thrust of his defense was that he did not entertain the requisite intent to be guilty of the crimes charged. In pursuit of that defense defendant introduced the evidence of his involuntary intoxication and the delusions resulting therefrom, urging that that evidence negated proof of his having entertained the specific intent necessary for conviction. The effect of mistake, of course, is to negate the element of intent. Thus, although the word "mistake" may not have been used, the facts establishing the defense of mistake were tried and they establish the defense as a matter of law. Under these circumstances it is incumbent upon us to consider on appeal the theory of mistake. In so doing, we consider nothing that was not considered in the trial court; we consider only what was considered in the trial court, albeit under a different label.

Having concluded the evidence establishes as a matter of law that defendant's conduct falls within subdivision Three of Penal Code section 26, the judgment of conviction is reversed with directions to the trial court to enter a judgment of not guilty.

Morris, P. J., and Rickles, J., concurred.