[Crim. No. 13791. Third Dist. June 11, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES JACOB RASZLER, Defendant and Appellant.

**COUNSEL**

James Martin McAllister, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Edmund McMurray, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**RYAN, J.**\*—The trial court convicted defendant of violating Penal Code section 245.2[1] (assault with a deadly weapon on a public transit employee) and sentenced him to the lower term of three years in state prison. On appeal, he contends: (1) the trial court denied him due process of law by excluding the testimony of a court-appointed psychiatrist as to defendant's mental state at the time he was alleged to have committed the assault, (2) there was insufficient evidence to support the conviction, and (3) the sentence imposed constituted both a denial of equal protection and cruel and unusual punishment. As we conclude defendant's contentions are without merit, we shall affirm the judgment.

At approximately 11:30 p.m. on July 5, 1983, Jeffrey Schueler, a train attendant for Amtrak, attempted to eject defendant from the seat reserved for Schueler on the Amtrak train bound for Seattle. Thereupon, defendant became agitated, pulled out a knife, and, holding it toward Schueler, announced he was hijacking the train to Florida. The train's conductor, Charles Halter, was summoned and proceeded to the car in which defendant was constraining Schueler. When Halter, who was wearing a uniform clear-

---

\*Assigned by the Chairperson of the Judicial Council.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

ly identifying him as the Amtrak conductor, drew near defendant and Schueler, defendant thrust his knife at Halter, coming within a foot of his body, and stated, "Hold it right there, motherfucker." Thereafter, defendant refused to surrender his knife or to allow Schueler and Halter to leave. Periodically until he finally surrendered to Roseville police sometime after midnight, defendant reiterated, "I want to go to Miami and see the President."

At trial, Schueler testified that during the incident aboard the train defendant made several remarks to the effect that "they were after me." Defendant informed the arresting officer, "There are people trying to kill me." Defendant testified that while in Davis earlier that day he realized several people who meant him harm were following him, so he went to the Davis Police Department. When he received no assistance there, he decided to board the Amtrak train bound for Oregon, on which he again saw the people he thought were following him. Defendant admitted brandishing his knife at the conductor, adding that "I didn't know what to tell the conductor, you know, and I thought when I was in Davis I could be arrested, but I was afraid people would—could also be arrested and follow you into jail, so I wanted a commitment. I thought that with all these people watching I could get the police to arrest me and make a commitment. It would be a public arrest."

Defendant specifically declined to plead not guilty by reason of insanity.

I

Defendant cites as a deprivation of his right to due process of law the trial court's decision to exclude the testimony of Dr. C. E. Parrish, a psychiatrist appointed by the court for the apparent purpose of advising defendant on the possibility of changing his plea to one of not guilty by reason of insanity and on his grounds for presenting a defense based on his mental condition. The gravamen of defendant's contention is that Dr. Parrish's testimony was essential to establishing, by way of a defense, that defendant's conduct was necessary under the circumstances as he perceived them and, hence, legally justified.

The prosecution specifically objected to the testimony of Dr. Parrish, whereupon counsel for defendant made the following offer of proof: "The doctor will show that [defendant] did believe that there were people chasing him. That there were in his mind people chasing him, and he does realize what he was doing to avoid the people that were chasing him. The doctor will come in and testify to his mental state that he did have that in his mind." Counsel further indicated that his objective in presenting such evi-

dence was to establish that, under section 26, defendant was not capable of committing the offense charged. That section provides in relevant part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Three—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent."

As he did at the hearing in the trial court on the matter of Dr. Parrish's testimony, defendant posits for our scrutiny a legal theory representing the coalescence of two defenses to crime, mistake of fact and necessity. In advancing that theory, defendant relies principally on *People* v. *Scott* (1983) 146 Cal.App.3d 823 [194 Cal.Rptr. 633], a position which the court below deemed unsound inasmuch as *Scott,* in the trial court's opinion, involved "extremely strange and rare facts" and "should be limited to its facts."

In *Scott,* evidence established that the defendant unknowingly and hence involuntarily ingested a hallucinogen which caused him to act in a bizarre and irrational manner and that, acting under a resultant delusion that he was a secret government agent compelled to save his own life or that of the President, defendant attempted to commandeer several vehicles without the consent of their owners. The defendant was convicted of two counts of unlawfully taking a vehicle without the consent of its owner. (Veh. Code, § 10851.) On appeal, he contended that under section 26, subdivision Three, the evidence was insufficient to establish the element of criminal intent. The Court of Appeal agreed and reversed with instructions to the trial court to enter a judgment of not guilty. In so holding, the court reasoned as follows: "It is clear that in attempting to commandeer the vehicles defendant acted under a mistake of fact: he though he was a secret government agent acting to protect his own life or possibly that of the President. When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. (*People* v. *Osborne* (1978) 77 Cal.App.3d 472, 479 [143 Cal.Rptr. 582].) If in fact defendant were a government agent and either his life or the life of the President were in danger and defendant attempted to commandeer the vehicles for the purpose of saving his own life or that of the President, his actions would have been legally justified under the doctrine of necessity. [Citations.] [¶] Penal Code section 26 does not expressly require that the vitiating mistake be reasonable, but we may assume for purposes of this decision that it must. (See Civ. Code, § 1577; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377-378 [303 P.2d 721].) Although defendant's mistake of fact was undoubtedly irrational, it was also undoubtedly reasonable under the circumstances, because the circumstances include that the mistake emanated from a delusion caused by defendant's involuntary intoxication resulting

from unknowingly ingesting some unspecified hallucinogenic substance." (*Scott, supra,* at pp. 831-832; fns. omitted.)

Defendant's reliance on *Scott* falls short of its target. ▉ It is beyond dispute that "a person is not guilty of a crime if he commits an act or omits to act under an honest and reasonable belief in the existence of certain facts and circumstances *which, if true, would make such act or omission lawful.* (Italics added.)" (*People* v. *Osborne, supra,* 77 Cal.App.3d at p. 479.) For present purposes, we accept as correct the manner in which the *Scott* court projected the foregoing principle onto the factual situation presented there.[2] Essentially, the holding in *Scott* was founded upon the following premises: first, a mistaken belief in the existence of certain facts, though that belief be the product of a delusion, *may* nonetheless be deemed "honest and reasonable," and, second, a delusional belief which constitutes an "honest and reasonable" mistake of fact *may* serve as the foundation for a defendant's invocation of the doctrine of necessity.

▉ Even our acceptance of these premises from *Scott,* supplemented by the assumption that Dr. Parrish could and would substantiate the defendant's claim of delusions, still does little to benefit defendant since, as a matter of law, defendant could not establish that his conduct toward Charles Halter was legally justified under the doctrine of necessity.

Under that doctrine, which derives from tort law and has been described in another context as "one with severe limitations" (*People* v. *Lovercamp* (1974) 43 Cal.App.3d 823, 832 [118 Cal.Rptr. 110, 69 A.L.R.3d 668]), an act "must not only appear to be necessary for the protection of person or property, but must also be reasonable for that purpose, in the light of the threatened harm . . . ." (Rest.2d Torts, § 263, com. on subsection (1), p. 497.) Therefore even if the circumstances which confronted defendant entitled him under the doctrine of necessity to resort to *some* criminal act for his own protection, not just any criminal act which might eventually bring about his safety would qualify as an appropriate means to that end. (See Comment (1981) 29 UCLA L. Rev. 409, 434.) Indeed, in attempting to secure protection from his ostensible stalkers, defendant was essentially obligated to utilize the least costly alternative.

---

[2]Our tentative acceptance of *Scott* should not be misconstrued as our imprimatur of the universal application of that decision. As the trial court perceptively noted, *Scott* involved outlandish circumstances where "defendant unknowingly and therefore involuntarily ingested some kind of hallucinogen which caused him to act in a bizarre and irrational manner. . . ." (*Id.,* at p. 831.) The involuntary ingestion of drugs is the linchpin to the doctrine of unreasonable mistake articulated in *Scott.* Without that indispensable ingredient, the unrestricted application of the unreasonable mistake of fact doctrine would effectively, and impermissively, abrogate the defense of insanity.

It is plain that defendant completely disregarded available nonviolent methods of rendering himself to Amtrak authorities who were capable of ameliorating his ostensibly grave circumstances. (See *People* v. *Lovercamp, supra,* 43 Cal.App.3d at p. 832.) Instead, he opted to attempt the infliction of great bodily harm upon the conductor, an act which conceivably imperiled other passengers. Consequently, even if the facts had been as defendant delusionally perceived them, they would have provided no justification or excuse for his crime. Because he selected an inappropriate means for attaining safety, defendant was foreclosed from taking shelter in the doctrine of necessity. As such, the court did not abuse its discretion in excluding the testimony of Dr. Parrish.

## II

■ It follows from our discussion of the doctrine of necessity that defendant's challenge to the sufficiency of the evidence is without foundation. Section 245.2 prohibits "an assault with a deadly weapon or instrument or by any means of force likely to produce great bodily injury upon the person of an operator or driver of a . . . motor vehicle operated on land, including a vehicle operated on stationary rails or on a track or rail suspended in the air, used for the transportation of persons for hire, or upon the person of a station agent or ticket agent for the entity providing such transportation, when the driver, operator, or agent is engaged in the performance of his or her duties, and where the person who commits the assault knows or reasonably should know that the victim is engaged in the performance of his or her duties . . . ." Amtrak conductor Charles Halter testified that defendant thrust a knife at him while he was on duty, stopping the weapon within a foot of Halter's body and instructing the conductor "Hold it right there, motherfucker" and "I want to go to Miami and see the President." That evidence, augmented by defendant's own testimony that he then knew Halter to be the conductor of the train on which he was riding, constitutes substantial evidence to support defendant's conviction of violating section 245.2.

## III

■ Next, defendant contends his sentence constitutes a denial of equal protection of the laws inasmuch as there is a sentencing disparity between section 245.2 (assault with a deadly weapon on a public transit employee) and section 245, subdivision (a)(1) (assault with a deadly weapon) in that the former is punishable by imprisonment for three, four, or five years while the range of sentences for the latter is two, three, or four years. At the threshold, the proponent of an equal protection claim must demonstrate that the challenged state action results in disparate treatment of persons who are

similarly situated with regard to a given law's legitimate purpose. (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; see also *In re Strick* (1983) 148 Cal.App.3d 906, 912-913 [196 Cal.Rptr. 293].)

With regard to a disparity in the range of possible sentences, "it is one thing to hold, as did [*People* v. *Olivas* (1976) 17 Cal.3d 236, 251 (131 Cal.Rptr. 55, 551 P.2d 375)], that persons convicted of the *same crime* cannot be treated differently. It is quite another to hold that persons convicted of *different crimes* must be treated equally. The latter are not similarly situated for equal protection purposes." (*Smith* v. *Municipal Court* (1978) 78 Cal.App.3d 592, 601 [144 Cal.Rptr. 504].) The evident purpose of section 245.2 is to afford particular protection from assaults to those operating vehicles of public transportation, whose occupations render them uniquely vulnerable to crimes of violence. (Stats. 1982, ch. 172, § 8, pp. 550-551.) In view of that purpose, it is plain that, by virtue of having assaulted Amtrak conductor Charles Halter, defendant is not situated similarly to a defendant who might have assaulted someone other than a public transit employee. Accordingly, we hold that defendant's argument, as framed, fails to raise an equal protection issue.

■ Finally, defendant contends his sentence of three years for assaulting Charles Halter constitutes cruel and unusual punishment because it is grossly disproportionate to the gravity of his conduct and represents excessive punishment for his offense. He argues that a punishment may contravene provisions of the state Constitution (art. I, § 17) and the federal Constitution (8th Amend.) if, "although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) Principally, defendant argues that comparison of his sentence with lesser punishments imposed either in this state for conduct defendant deems more serious than his, or in other jurisdictions for conduct defendant deems comparable to his own, makes plain the disproportionality of his sentence.

At the outset, we do not concur with defendant that there exists in this state a host of offenses which, though punished less severely than his crime, involve palpably more serious conduct. The apparent basis of defendant's assessment of such other crimes is that, "if successfully completed [they] lead to serious bodily and psychic injury." His position that the offenses which he enumerates in his brief are more serious than his own is unsound. Unlike the instant offense, the crimes suggested by defendant, most of which are forms of assault, do not necessarily involve the use of a deadly weapon or force likely to produce great bodily injury. Without diminishing the se-

riousness of these offenses, we decline to assume for the purpose of rendering the comparison solicited by defendant that the noted offenses "must be deemed more serious" than the crime of assault with a deadly weapon upon a public transit employee whether that crime is viewed in the abstract or as defendant committed it. (*Id.*, at p. 426.)

Additionally, we observe, as defendant concedes, that in no state besides California is an assault with a deadly weapon upon a working public transit employee defined and punished as an offense separate and apart from an assault with a deadly weapon upon a person not so engaged. The court in *Lynch* noted that in comparing the challenged punishment to those inflicted for the same offense in other jurisdictions, a court necessarily proceeds on the assumption that "the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; . . ." (*Id.*, at p. 427.) Manifestly, it would be an exercise in futility for this court to engage in such comparison here inasmuch as no other state has yet demonstrated California's resolve to deter assaults upon transit employees by proscribing the conduct with similar particularity and instituting suitably harsh punishment therefor. Simply stated, it avails us little to seek out a standard of proportionality that obviously could not exist.

We are satisfied that defendant's punishment is not so disproportionate to his crime that it "shocks the conscience and offends fundamental notions of human dignity." The record reveals that defendant's conduct did not, as he would apparently have us believe, amount merely to a brief moment of aberrant behavior. Rather, his underlying conduct actually involved the taking of two hostages, both unarmed Amtrak employees, whose liberty he restrained for more than 30 minutes, during which time he threatened one of the employees with great bodily injury after actually trying to inflict the same. While it is true defendant's prior criminal record was insignificant, the trial court properly ruled out probation for him because of his transient lifestyle (see Cal. Rules of Court, rule 414(d)(3), (4), and (5)) and imposed a term of imprisonment that was not cruel and unusual.

The judgment is affirmed.

Evans, Acting P. J., and Sparks, J., concurred.