[No. D012378. Fourth Dist., Div. One. Nov. 27, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN M. GEDDES, Defendant and Appellant.

[No. D013890. Fourth Dist., Div. One. Nov. 27, 1991.]

In re JOHN M. GEDDES on Habeas Corpus.

## COUNSEL

Gordon H. Frevel, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis and Jefferey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, J.**—Defendant John M. Geddes appeals from a judgment of conviction after a jury found him guilty on one count of arson. (Pen. Code, § 451, subd. (b).)[1] He has also filed a related petition for writ of habeas corpus challenging the competence of his trial counsel. As we shall explain, we reject his numerous contentions of error and affirm the judgment. We also deny the writ petition.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

## Factual and Procedural Background

In the fall of 1989, Geddes lived in the same Rancho Peñasquitos condominium complex as Steven McFarland. Approximately 8 o'clock one morning, McFarland was awakened by the sound of loud music and breaking glass coming from Geddes's condominium. McFarland went outside to investigate and saw Geddes throwing things out of the window.

Fifteen minutes later, smoke began coming out of the windows of Geddes's apartment. McFarland then saw Geddes on the roof wearing only a pair of shorts and tennis shoes. Blood was smeared on his face, hands and legs. Geddes moved toward McFarland and said, "There is a hostage situation. There are two guns. My wife, my daughter are being held."[2] Trying to calm Geddes, McFarland told him, "The police have been called. Just try to relax." Geddes responded, "Don't tell them I'm here. They might shoot me. They may think I'm the one."

San Diego Police Officer Kevin Gott arrived shortly thereafter. In response to Gott's request, Geddes jumped down from the roof. Geddes told Gott he started the fire as a diversion because some people were "after his wife and baby." Later, while Gott was driving Geddes to the San Diego Police Department Metro Arson Strike Team office, Geddes told him, "I started the fire. Get real, man. I am not crazy. I know what I'm doing" or "I knew what I was doing."[3]

A fire investigator testified that the fire appeared to have been deliberately set by Geddes using a bottle of isopropyl alcohol and a blue rag. He also testified that the condominium showed signs of extensive "mechanical damage," which he defined as property damage caused by force rather than fire. This included a broken window, sliding glass door and a large hole in a closet wall.

## Discussion

*Issues Relating to Geddes's Failure to Enter a Plea of Not Guilty by Reason of Insanity*

During the presentation of the prosecution's case, the trial court became aware that Geddes planned to assert a mistake-of-fact defense based on his claim that he was operating under a delusion when he set the fire. During a

---

[2]McFarland did not believe Geddes's wife and daughter were living with him at the time of the incident.

[3]Both McFarland and his wife characterized Geddes's behavior as "bizarre." Neither McFarland nor Gott smelled alcohol on Geddes's breath.

conference with counsel in the course of expressing reservations about instructing on a mistake-of-fact theory, the court inquired whether defense counsel had considered using the evidence of delusions as the basis for entering a plea of not guilty by reason of insanity (NGI). Counsel replied that he had discussed the issue with his client and Geddes refused to enter such a plea.

Recognizing that the decision to enter an NGI plea is a personal one for the competent defendant (*People* v. *Gauze* (1975) 15 Cal.3d 709, 717 [125 Cal.Rptr. 773, 542 P.2d 1365]), the judge later spoke directly with Geddes. She assured herself that he had thoroughly discussed the subject of an NGI plea with counsel. Geddes replied, "I fully understand it." The court explained to Geddes the nature of an NGI plea, specifically noting that the fact he was currently sane did not preclude his entering a plea claiming he was temporarily insane at the time of the offense. After consultation with Geddes, counsel again reaffirmed his client's desire not to enter an NGI plea.

▮▮▮ Geddes's principal argument on appeal and in his writ petition is that trial counsel rendered ineffective assistance by failing to arrange for a psychiatric examination of Geddes to determine whether an NGI plea was factually supportable. He relies on *People* v. *Mozingo* (1983) 34 Cal.3d 926 [196 Cal.Rptr. 212, 671 P.2d 363] for the proposition that a lawyer renders ineffective assistance where he or she fails to retain a psychiatrist to investigate possible mental defenses despite the fact that the defendant rejects the defense and refuses to cooperate in developing it. (*Id.* at p. 934.)

We question Geddes's broad reading of *Mozingo*. *Mozingo* was a complex capital murder case in which the missing psychiatric evidence was relevant at three different levels. As in this case, it might have supported an NGI plea. It could also have been used to develop a diminished capacity defense. Finally, such evidence would have been admissible in mitigation at the penalty phase of Mozingo's trial. It is not necessarily clear that the result in the case would have been the same had the psychiatric testimony been relevant only to support an NGI plea rejected in advance by the defendant.

Moreover, the Supreme Court's opinion does not specify the extent to which Mozingo was aware of the viability of an insanity defense at the time he rejected the possibility of an NGI plea. Presumably the purpose of ordering a psychiatric examination would be to gather information to insure defendant makes an informed decision as to which plea or pleas to enter. Here, the trial judge explored the issue directly with Geddes, indicating her view that an NGI plea was warranted. Geddes in effect replied, "I know I may have a valid insanity defense. I also know what the ramifications of a

successful insanity defense are. Even if an NGI plea would ultimately succeed, I do not want to enter one." Under these circumstances, for counsel to retain a psychiatrist to inform the defendant of facts he has already assumed to be true seems an academic exercise at best.

Finally, a defendant alleging ineffective assistance based on counsel's failure to obtain favorable evidence must use a petition for writ of habeas corpus to demonstrate the evidence which would have been obtained and, to the extent possible, its effect. (See *People* v. *Coleman* (1988) 46 Cal.3d 749, 773 [251 Cal.Rptr. 83, 759 P.2d 1260].) In *Mozingo*, for example, two psychiatrists testified at the reference hearing on the petition about Mozingo's mental condition as a possible explanation for his criminal behavior. (34 Cal.3d at pp. 932-933.) Here, in contrast, there is no evidence to indicate that a psychiatric examination would have supported an NGI plea. Equally important, there is nothing to indicate any psychiatric information would have caused Geddes to change his mind and agree to enter an NGI plea. Because it is now clear a showing of prejudice is essential to a claim of ineffective assistance of counsel (*Strickland* v. *Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 691-693, 104 S.Ct. 2052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839]), the lack of such evidence is fatal to Geddes' claim.[4]

*Instructional Issues Relating to Geddes's Delusions*

Proffering several different theories, Geddes contends the trial court erred in failing to instruct the jury that the evidence he was suffering from a delusion, if believed, could operate to reduce his culpability for setting fire to the condominium.[5] He suggests the jury should have been instructed on the doctrines of duress, necessity and reckless causing of a fire (§ 452).

A number of cases have discussed the extent to which mental delusions which motivate a defendant's criminal conduct should mitigate or excuse

---

[4] We are similarly unpersuaded by Geddes's suggestion that the advisement requirements of *People* v. *Redmond* (1971) 16 Cal.App.3d 931, 938 [94 Cal.Rptr. 543], regarding a defendant's request to *withdraw* an NGI plea, should be extended to all cases in which the trial court believes the evidence would support the entry of such a plea. *Redmond* is explicitly premised on the fact that the withdrawal of an NGI plea may, depending on the circumstances, have "some characteristics of a guilty plea and some resemblances to a plea bargain." Under such circumstances, *Boykin-Tahl* advisements are necessary. (See *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) Such a rationale does not suggest the need for advisements every time the trial judge thinks the defendant could enter an NGI plea.

[5] Geddes also argues the court erred in excluding proposed psychiatric testimony which would have corroborated his claims of delusions. Such a contention necessarily assumes the court should have instructed the jury on a theory of defense or mitigation to which the evidence would have been relevant. Thus, in deciding how the court should have instructed the jury, we assume the psychiatric testimony would have been admissible.

that conduct. In *People* v. *Scott* (1983) 146 Cal.App.3d 823 [194 Cal.Rptr. 633], the defendant became involuntarily intoxicated and began experiencing delusions after drinking drugged punch at a party. Believing he was a Central Intelligence Agency agent assigned to protect the President from persons trying to kill him, Scott attempted to commandeer several vehicles. Relying on section 26, subdivision 3, the court concluded Scott was operating under a reasonable mistake of fact: "If in fact defendant were a government agent and either his life or the life of the President were in danger and defendant attempted to commandeer the vehicles for the purpose of saving his own life or that of the President, his actions would have been legally justified under the doctrine of necessity." (146 Cal.App.3d at p. 831.) The court explained that Scott's mistake of fact was reasonable because it was induced by the involuntary consumption of a drug. (*Id.* at p. 832.)

In *People* v. *Raszler* (1985) 169 Cal.App.3d 1160 [215 Cal.Rptr. 770], the defendant attempted to rely on *Scott* in a situation in which he assaulted a train conductor and claimed he was hijacking the train to Florida. Defendant asserted he suffered from a delusional mental condition which caused him to believe people were chasing him and threatening to kill him. While expressing some reservations about applying *Scott* to a case of delusions caused by mental illness rather than involuntary intoxication (*id.* at p. 1165, fn. 2), the *Raszler* court concluded the mistake-of-fact defense was in any event unavailable because the means defendant chose to resolve his delusional difficulties were unreasonable. "[E]ven if the facts had been as defendant delusionally perceived them, they would have provided no justification or excuse for his crime. Because he selected an inappropriate means for attaining safety, defendant was foreclosed from taking shelter in the doctrine of necessity." (*Id.* at p. 1166.)

*Raszler* was followed by *People* v. *Gutierrez* (1986) 180 Cal.App.3d 1076 [225 Cal.Rptr. 885] in which a mother accused of beating her children testified she believed they were evil birds she had to kill. A psychiatrist opined that any mental illness she suffered from was the product of her having voluntarily ingested illicit drugs. (*Id.* at p. 1080.) Relying on a broad reading of *Raszler*, the *Gutierrez* court concluded that "[w]hile involuntary intoxication is a circumstance which may be considered in determining reasonableness [in the context of a mistake-of-fact defense], mental illness is not." (*Id.* at p. 1083.)

Finally in *People* v. *Uriarte* (1990) 223 Cal.App.3d 192 [272 Cal.Rptr. 693], the defendant killed two people and wounded a third purportedly because he believed they were holding his wife in a closet. Based on reasoning similar to that used by the court in *Raszler*, this court concluded

defendant was not entitled to an honest-but-unreasonable belief instruction (see generally *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]) because, even if Uriarte's wife was being held, his shooting of three unarmed victims was not a necessary means to rescue her. (*Id.* at p. 198.)

Like the courts in *Raszler* and particularly *Gutierrez*, we question whether a mistake-of-fact defense is appropriately utilized where defendant's delusions are the product of mental illness and/or voluntary intoxication. As in *Raszler* and *Uriarte*, however, we find it unnecessary to decide this fundamental question because here, the evidence shows Geddes reacted in an unreasonable fashion to his admittedly unreasonable delusion. Assuming Geddes's wife and daughter were being held hostage and his phone was out of order, there were certainly less destructive ways of seeking assistance other than setting fire to the building. Indeed, he later climbed out on the roof and talked with Steven McFarland. (See *ante*, pp. 451-452.)

Viewed in this light, there was no evidence to support the requested instructions on duress and necessity. The concept of duress is simply inapplicable—there was no suggestion that Geddes was forced to set fire to the condominium by threats of death or great bodily injury. (See CALJIC No. 4.40; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 231, pp. 267-269.) As for a claim of necessity, we have already explained Geddes cannot claim setting the fire was necessary where other means existed to summon help.

Finally, the court did not err in refusing to instruct on the lesser included offense of recklessly causing a fire. (See § 452.) There was no question here Geddes intended to cause a fire. The only issue was his motivation. He claims the fire was not "maliciously" set (§ 451) because he was operating under a delusion. "Maliciously" is defined for the purposes of section 451 as including "an intent to do a wrongful act . . . ." (§ 450, subd. (e).) Here, as we have explained, even if Geddes's purported delusion is taken into account, his act in setting fire to the building was nonetheless wrongful because it was not reasonably necessary to save his wife and daughter. Accordingly, the lesser included offense instruction was not required.

*Sentencing*

The court sentenced Geddes to the middle prison term of five years, rejecting the probation report's recommendation of the three-year lower term. Pointing to certain statements made by the trial court at sentencing, Geddes contends the court relied on improper factors in selecting the middle-term.

In explaining her sentencing decision including her decision to deny probation, the trial judge indicated that Geddes was an alcoholic and clearly suffered from a mental illness. She was concerned that he continued to represent a serious danger to society because he refused to seek help for his alcoholism. She was particularly troubled by the fact that Geddes knowingly declined to pursue an insanity defense which might have resulted in treatment for his delusional mental condition.

The parameters for our review include the fact that Geddes was presumptively ineligible for probation. (§ 1203, subd. (e)(9).) Moreover, the fact that the probation report recommended the lower term does not make that the presumptively correct sentence. (See generally *People* v. *Langevin* (1984) 155 Cal.App.3d 520 [202 Cal.Rptr. 234].)

We disagree with Geddes's assertion that the trial court punished him more severely because he was an alcoholic and suffered from a mental illness. The court recognized that Geddes's mental condition was a mitigating factor but concluded that his refusal to acknowledge his problems and seek help made him a greater danger. On balance therefore, when compared to the other aggravating and mitigating factors, the court could properly conclude that Geddes's mental difficulties did not warrant the mitigated lower term.

*Restitution*

Pursuant to Government Code section 13967, subdivision (c), the trial court ordered that Geddes pay restitution in the amount of $5,993 to Donald Casenave, the owner of the condominium rented by Geddes. Government Code section 13960, subdivision (d) defines a victim's "pecuniary loss" for the purpose of such a restitution order as "any expenses for which the victim has not and will not be reimbursed from any other source." ▮ Geddes contends the trial court erred in failing to inquire of Casenave whether he had sought or would seek reimbursement from his insurance company for the damage caused by the fire.

If Geddes was concerned about the possibility of double reimbursement for Casenave, it was incumbent on him to raise the issue in the trial court. Having failed to do so, he cannot raise the issue for the first time on appeal. Geddes relies on *People* v. *Williams* (1989) 207 Cal.App.3d 1520 [255 Cal.Rptr. 778], in support of his assertion that the court's error is jurisdictional and may therefore be raised at any time. *Williams* is clearly distinguishable. There, the trial court attempted to order restitution paid to an insurance company which had previously reimbursed the victim. The Court

of Appeal held the restitution statute did not authorize payment to an insurance company and that the court's order was therefore in excess of jurisdiction. (*Id.* at p. 1524.) Here, in contrast, the court ordered payment to the direct victim. The restitution order may or may not comply with section 13960's requirement that the victim "has not or will not be reimbursed from any other source." The court clearly had jurisdiction to order restitution paid to Casenave. The only question is whether the record is sufficient to support the order. By failing to request more specificity at a time when it could have been easily provided, Geddes has waived any complaint.

### DISPOSITION

Judgment affirmed. Petition for writ of habeas corpus denied.

Kremer, P. J., and Todd, J., concurred.

A petition for a rehearing was denied December 12, 1991, and appellant's petition for review by the Supreme Court was denied February 19, 1992.