[No. B095130. Second Dist., Div. Seven. Aug. 19, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK BERNARD ROCHA, Defendant and Appellant.

COUNSEL

Bruce Daniel Rosen, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WOODS, J.**—A jury found appellant guilty of attempted murder (Pen. Code, §§ 664/187; statutory references, unless otherwise noted, are to the

Penal Code), two counts of mayhem (§ 203), found true a great bodily injury allegation (§ 12022.7, subd. (a)) and three deadly/dangerous weapon allegations (§ 12022, subd. (b)). They found appellant not guilty of attempted robbery (§§ 664/211) and aggravated mayhem (§ 205) and hung on an attempted murder charge (§§ 664/187).

Three prior felony conviction allegations (§§ 288, subd. (b), 286, subd. (c), and 487, former subd. 2) were bifurcated, jury was waived, all were found true, two as "strikes" (§ 667, subds. (b)-(i)) and five-year priors (§ 667, subd. (a)(1)), all three as state prison priors (§ 667.5). Appellant was sentenced to state prison for 62 years to life.

Appellant's principal contention is the trial court improperly restricted defense counsel's examination of the defense psychiatrist. We find this and appellant's other contentions meritless and affirm the judgment.

## FACTUAL BACKGROUND

It was conceded that appellant had repeatedly bludgeoned Diane T. and her 13-year-old daughter V. As defense counsel stated in his opening statement: "What our defense concerns is why this nightmare took place toward those two innocent people."

The issue at trial was whether appellant was so incapacitated from drugs and alcohol that he could not and did not have the *specific intent* required for attempted murder.

We summarize the evidence.

On September 6, 1994, Diane T., a 49-year-old psychiatric geriatric social worker, lived in an apartment at 8532 Saturn Street, West Los Angeles, with her 13-year-old daughter V. and 5-year-old daughter L. Her parents lived in the same building on the floor above hers.

Appellant, 41 years old, his mother, half brother, and sister lived in an adjacent apartment building.

The T.'s and appellant had been neighbors and casual acquaintances for seven years. They had never argued. Once, while the T.'s were away, appellant had walked their dog. Once appellant had helped Diane T. color her hair.

Appellant's mother (Delores Alvarez) had heart trouble and neighbors, like Diane T., knew of her condition because emergency ambulances came

there. But on September 6, 1994, appellant's mother felt fine. She went to church early that morning, had some duties there, and stayed all day. She returned home about 5:30 p.m. Her phone was in good working order and later that evening she used it to dial 911.

At 9 p.m. on September 6, 1994, L. and V. were in their bedroom. Its sliding glass door was triple locked and nailed shut. They were in separate beds, L. asleep and V. reading. When the front doorbell rang, V. sat up.

Diane T. was in the living room when the doorbell rang. She walked to her double locked front door and asked who was there. Appellant responded "Mark" and, recognizing his voice, Diane T. unlocked the door, opened it slightly, and asked what was wrong.

V. heard appellant identify himself, and curious what he might want, got out of bed and walked through the hall to the living room doorway.

Appellant answered Diane T. by saying "I need to use your phone. Our phone's out of order and I think something has happened to my mother, maybe she's having a heart attack or something. She's real sick, can I use the phone?"

Diane T. was shocked, stepped back, and pointed to the phone. Appellant entered and went to the phone. Diane T. left the door unlocked.

When V. asked "Why don't you lend him your car?" her mother told her to go back to bed. V. returned to her bedroom, sat on her bed, and listened.

As appellant used the phone Diane T. stepped to her couch and sat down. Suddenly, from behind his back, appellant "pulled out . . . this giant pipe . . ." [it was a jack handle] and, standing facing her, raised it overhead with both hands and, in a chopping motion, struck her on the head. Appellant then swung the jack handle like a baseball bat, striking Diane T. in the head a second time. He struck her in the head a third time.

Appellant told Diane T., and she remembered his exact words, "I'm going to kill you and then I'm going to get your kids."

V., sitting on her bed, heard "loud moaning . . . pounding noises . . . blows . . . ." She noticed "that Mark wasn't saying anything." She hesitated two or three seconds and then went to the living room doorway. She saw appellant, his back to her, standing over her mother, between the coffee table and couch, as her mother went through convulsions on the floor. V. "stood there for about a second [and] didn't know what was happening . . . ."

Then appellant turned and said "[V.], your mom's really sick, call 911. Go, go, go, just do something."

V. ran to the phone in her bedroom, sat on her bed, dialed 9, dialed 1, was about to dial the second 1 when she "suddenly saw [appellant] standing in front of [her] holding a long metal pipe . . . . He held it high above his head . . . and then pounded it down on [her] head before [she] could even scream."

In V.'s words: "I was still conscious, I was totally—I was in excruciating pain and I was completely shocked. This was a neighbor we had known all this time and I had never expected such a thing. I screamed, 'What are you doing, what are you doing?' "

Appellant "raised . . . the pipe again, but before he let it down on top of [her] head again, he took one hand off . . . and placed . . . his forefinger on his lips and said, 'shh, shh . . . .' "

V. was about to scream but stopped "because [she] thought maybe if [she] quieted down he would stop . . . ." Appellant again holding the jack handle with both hands "raised it as high as he could [and] pounded it down [on (V.)'s] head." V. screamed and tried to shield her head with her hands. Appellant struck her again. She crawled around his legs and gripped a dresser drawer. Appellant struck her in the head twice more.

V.'s little dog barked at appellant when he struck V. so he paused, bent over, petted the dog, and said " 'it's okay'."

V. let go of the dresser drawer, saw "blood all over the floor," tried to close her eyes, thought she was "going to die," and was in a "fetal position" when appellant left the room.

Five-year-old L. remained asleep.

After a time, V. struggled to her feet and "holding onto the sides of the walls for support . . . stumble[d] through the hall . . . into the doorway . . . [and] saw [appellant] standing over [her] mother with the pipe hitting her."

V. stumbled and crawled to the front door, tried to open it but couldn't because, now, it again was double locked. Appellant grabbed her hair, dragged her into the hall, struck her in the face with the jack handle, choked her with one hand and when she tried to pry his hand loose, hit her on the head with the jack handle. V. then lost consciousness.

Neighbors, including Diane T.'s elderly father, heard the screams and pounding and came to her front door. When one of her neighbors, Sandy H., heard Diane T. say "somebody help, somebody help," he tried to open the door, could not, and knocked it open with his shoulder. He saw Diane T. in a pool of blood, half on, half off the sofa, her skull gashed open and a finger hanging off. He "ran to her . . . saw that her head was open . . . [and] [s]o [he] closed it up with [his] hand and [he] noticed she was saying 'the children, the children'." When Mr. H. saw Diane T.'s dangling finger he "put it back and [continued] to hold it."

Mrs. H. went to the children's bedroom, took five-year-old L. in her arms, and carried her upstairs to her apartment.

Mr. H. saw appellant holding a bloody towel wrapped around something.

Diane T.'s father, who was now in the apartment, also saw appellant with a bloody towel. He saw appellant drop the towel *and* his daughter's purse. When appellant tried to leave the apartment saying, "I need some air," appellant's brother and mother stopped him.

Police arrived, arrested appellant, and seized the jack handle and a knife blade and broken handle. Paramedics transported the unconscious victims to the hospital.

Diane T. was unconscious for about a month. She had multiple head and skull fractures, brain clots and contusions. She also was slashed across her breast and chest. Her injuries were life threatening and some were permanent.

V. T. was unconscious for two days and hospitalized for about two weeks. She had multiple scalp lacerations, a fracture in the right frontal sinus, a cerebral contusion, and bruising of her brain. Her injuries were not life threatening.

## DISCUSSION

1. *Appellant contends the trial court improperly restricted defense counsel's examination of the defense psychiatrist.*

██ A psychiatrist, Dr. William Vicary, was called as a defense witness.

Appellant claims the trial court improperly restricted defense counsel's examination of Dr. Vicary in two ways. First, by preventing defense counsel

from eliciting Dr. Vicary's opinion concerning whether appellant, when committing the crimes, *had* specific intent. Second, by preventing defense counsel from eliciting appellant's statements to Dr. Vicary, statements upon which Dr. Vicary relied in forming his opinions.

Appellant's argument (that the trial court erred) is lengthy (35 pages of his opening and reply briefs are devoted to this argument) and elaborate. He parses sections 22, 25, 28, and 29 and analyzes numerous appellate decisions construing those sections.

We need not address the substance of appellant's argument because the premise upon which it is based is mistaken. The trial court did *not* restrict defense counsel's examination of Dr. Vicary. We explain.

Prior to trial, at defense counsel request, the trial court appointed a psychiatrist to examine appellant. The appointed psychiatrist, Dr. Vicary, saw appellant twice for a total of six hours. He wrote a four-page confidential report in which he informed defense counsel that appellant was legally sane at the time of the offenses. He also concluded that appellant's consumption of alcohol and drugs had *not* produced "settled insanity." Further, he concluded or implied[1] appellant *had* specific intent during the crimes.

Notwithstanding these adverse conclusions, defense counsel determined to call Dr. Vicary as a defense witness, so informed the prosecutor, and provided the prosecutor Dr. Vicary's report.[2]

The basis for that determination was most lucidly stated by the trial court:

"A psychiatrist, under the current law, may testify to a person's *ability* to form an intent. They may not testify that the person *did* form the intent. But they are competent to testify that in their professional opinion this person *is capable* of forming a certain intent under given circumstances. It's for the trier of fact as to whether the person *did* form a specific intent at a particular time in question.

"If Mr. Bencangey (defense counsel) believes that the doctor's testimony would tend to either prove something that the defense is seeking to prove and is relevant under the law, or would tend to disprove something which the

---

[1]During a pretrial conference the prosecutor said "the doctor's ultimate conclusion based on his expert opinion is that the defendant had the requisite intent to fulfill these crimes . . . ."
[2]Trial court exhibit 1.

People are trying to prove as part of their case, then the doctor can certainly testify."[3] (Italics added.)

Thus, despite Dr. Vicary's opinion that appellant *had* specific intent, defense counsel could usefully call Dr. Vicary and elicit from him factors which tend to *negate* specific intent: drug addiction, alcohol consumption, decompensation, and self-destructiveness. Defense counsel, then, could urge the jury—which would not have heard Dr. Vicary's contrary opinion—to find appellant lacked specific intent.

This delicate defense strategy *depended* upon the exclusion of Dr. Vicary's opinion concerning appellant's specific intent. The record leaves little doubt concerning this strategy.

During one of the many bench conferences, this one before Dr. Vicary testified, the following colloquy occurred:

"THE COURT: All right.

". . . . . . . . . . . . . . . . . . . . . . . .

"He [Dr. Vicary] can be called to testify to whatever mental disease, defect or disorder the defendant had in his opinion which might have contributed to an ability to form a specific intent. He can't testify that he had it or he didn't have it. He's not allowed to go either way.

"[Prosecutor]: I can—I am certainly allowed to question him on the factors that would lead him to a conclusion that an individual—for instance, in this particular case, he's going to say the alcohol and drugs would diminish this particular person's ability to form the specific intent. I think that's what his testimony could—

"MR. BENCANGEY: Could.

"THE COURT: [ ] Could. Not would.

"[Prosecutor]: Okay.

"THE COURT: You're certainly entitled to ask him 'what other factors would you look at, Doctor, to determine whether in fact he had done so in a particular instance.' 'I would look at what he did, what he said, and how he did it.' That's what you are arguing to the jury. But when he said I'm going to kill you and he gave a ruse that he was planning and premeditating —

---

[3]Defense counsel's response was: "That's what I said."

"MR. BENCANGEY: I had no argument with any of this.

"THE COURT: I mean, you got to understand something, and I use—it's not exactly hyperbole, my analysis of this situation, the defense is grasping at straws, but I can't take the straws away from them.

"I mean—I don't think it's a subject of common knowledge, for example, what would the effect of—what possible effect would the taking of half a gram of cocaine daily for a month be on a person's ability to form a specific intent? I don't think the jury can answer that question on the basis of common knowledge. But a medical doctor or someone skilled in that area can tell us that. Whether it applies in this case or not, that's for the jury to decide.

"Is there evidence here that this guy was taking a half a gram of cocaine every day, and even if there is, is there other evidence indicative of what he said and did that would indicate that even so, he was capable of and did form an intent.

"[Prosecutor]: I—

"MR. BENCANGEY: That's exactly—all I want is the opportunity to bring those factors out."

In accordance with this strategy defense counsel called Dr. Vicary, established his expertise concerning drugs and their effects, and elicited that heroin, cocaine, and alcohol all *could* reduce a person's ability to form intent.

Additionally, defense counsel succeeded in having Dr. Vicary testify that appellant "had a very profound history of alcohol and drugs and that he was a drug addict." Dr. Vicary also testified "I think that there's very strong evidence that in the two weeks prior to the crime that he—decompensated. I mean, he was told that his blood test was positive for HIV, he thought he had AIDS and he just became very depressed and despondent and he started drinking heavily and shooting those speedballs and doing PCP too. And his own words, he said, 'I was suicidal, I wanted to kill myself by an overdose.'" Dr. Vicary added, "I mean, he just kept doing—drinking and drugs with a vengeance."

We conclude appellant's contention is meritless because the trial court did not restrict defense counsel's examination of Dr. Vicary.[4]

2. *Appellant contends the trial court erred in not giving CALJIC No. 17.01.*[5]

■ In its third amended information the prosecution alleged appellant had "personally used a deadly and dangerous weapon(s), to wit, knife *and* a jack handle . . . within the meaning of Penal Code Section 12022(b)." (Italics added.)

The trial court instructed the jury "A deadly or dangerous weapon means any weapon, instrument or object that is capable of being used to inflict great bodily injury or death." (CALJIC No. 17.16.)

CALJIC No. 17.01 (see fn. 5, *ante*) was not requested nor given.

In recording their guilty verdicts and true findings the jury used forms provided to them. Concerning the weapons use allegation the form stated ". . . the said defendant . . . personally used . . . a knife *and/or* a jack handle . . . ." (Italics added.) "True" was indicated on all three guilty verdicts.

Appellant argues that use of a knife and use of a jack handle are different acts and the trial court had a sua sponte duty to instruct the jury they "must agree that [the defendant] committed the *same* act." (CALJIC No. 17.01.) We disagree.

A jury must unanimously agree on guilt and on allegations enhancing guilt. They need *not* unanimously agree on theories of guilt or "on the precise factual details" of guilt. (*People* v. *Pride* (1992) 3 Cal.4th 195, 250 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Snead* (1993) 20 Cal.App.4th 1088, 1095-1096 [24 Cal.Rptr.2d 922]; *People* v. *Phan* (1993) 14 Cal.App.4th 1453, 1464-1465 [18 Cal.Rptr.2d 364].)

---

[4]In addition to Dr. Vicary's description of appellant's severe drug use, appellant's brother (Elias Rocha) testified to appellant's consumption of alcohol, cocaine, and heroin on the crime date and the preceding 10 days.

[5]The instruction reads: "The defendant is accused of having committed the crime of _____ [in Count _____]. The prosecution has introduced evidence tending to prove that there is more than one [act] [or] [omission] upon which a conviction [on Count _____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count _____], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

"[I]t . . . is well established that a trial court is not obligated to give an instruction—either requested or sua sponte—if the evidence presented at trial is such as to preclude a reasonable jury from finding the instruction is applicable. . . . 'A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged.' . . . In other words, '[i]f under the evidence presented such disagreement is not reasonably possible, the instruction is unnecessary.' " (*People* v. *Muniz* (1989) 213 Cal.App.3d 1508, 1518 [262 Cal.Rptr. 743], citations omitted.)

In the circumstances of this case, where it was conceded appellant had personally used a jack handle and that it was a deadly and dangerous weapon—and where the knife use allegation was surplusage—the trial court did not err in omitting CALJIC No. 17.01.

3.  *Appellant contends the trial court erred in failing to state reasons for a sentence choice.*

The trial court imposed both the personal weapon use enhancement (§ 12022, subd. (b)) *and* the great bodily injury enhancement (§ 12022.7). Doing so was a sentence choice.

Appellant contends the trial court prejudicially erred in failing to state reasons for this sentence choice. We disagree.

Although "[t]he court shall state the reasons for its sentence choice on the record at the time of sentencing" (§ 1170, subd. (c)), no particular form of statement is required. Although the trial court did not "item by item" specify each reason for each sentence choice, it was not essential he do so. The trial court, in unmistakable language, stated the reasons for his sentence choices.

He said: "In a real sense, there is no adequate punishment for the crime committed . . . . [¶] We can talk about the defendant's use of drugs and alcohol, but obviously there is something very necessary in the brain pattern that constitutes a human being as opposed to merely a Homo sapien that is missing from this defendant. . . . [¶] . . . [T]his defendant went from his residence in a very calculated fashion, not to just the nearest apartment, to a specific apartment, to unleash the fury of this attack. . . . [¶] And it was a calculated attack. . . . [¶] This man's getting sixty-two years to life. He will die in prison . . . he should never get out of prison."

Numerous aggravating circumstances specified in California Rules of Court, rule 421—many referred to by the trial court—were involved in these

offenses. The crimes involved great violence, bodily harm, and viciousness (rule 421(a)(1)), the defendant was armed with a weapon (rule 421(a)(2)), the victims were particularly vulnerable (rule 421(a)(3)), the crimes indicated planning (rule 421(a)(8)), and the defendant took advantage of a position of trust or confidence (rule 421(a)(11)). (See *People* v. *Gutierrez* (1992) 10 Cal.App.4th 1729, 1735-1739 [13 Cal.Rptr.2d 464].)

For this reason—and for others we omit to avoid belaboring the matter[6]—the contention is ill taken.[7]

4. *Appellant contends the trial court erred in its restitution order.*

██ The trial court ordered appellant to pay $19,400 restitution to the victim.

Appellant contends this order must be set aside because the prosecutor offered no evidence of the victim's losses and the order failed to specifically identify those losses. The contention is meritless.

At the sentence hearing, when the prosecutor requested the court order $15,908 restitution, defense counsel "just procedurally" objected "[t]here's been no evidence presented outside of just an assertion by counsel."

In response, the victim, Diane T., was called as a witness and testified to her "out of pocket" and ongoing medical expenses totaling $19,400. The trial court ordered restitution in that amount. Appellant did not then, and may not now, object. (*People* v. *Geddes* (1991) 1 Cal.App.4th 448, 457-458 [1 Cal.Rptr.2d 886]; *People* v. *Goulart* (1990) 224 Cal.App.3d 71, 83-84 [273 Cal.Rptr. 477]; *People* v. *Campbell* (1994) 21 Cal.App.4th 825, 831 [26 Cal.Rptr.2d 433].)

---

[6]Although sentencing occurred *after People* v. *Scott* (1994) 9 Cal.4th 331, 352-354 [36 Cal.Rptr.2d 627, 885 P.2d 1040], defense counsel did not object to any "reasons" omission.

The probation report, read and considered by the trial court, stressed it was "imperative" defendant be isolated for the maximum time possible.

Other reasons, eloquently stated by victim Diane T. (see appen., *post*) were also considered by the trial court.

[7]By supplemental letter brief appellant urges remand so the trial court may determine whether or not to exercise its limited discretion to dismiss one or more "strikes." (*People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628].) We reject the request because no dismissal motion was made to the trial court. Additionally, the record fails to show the trial court misunderstood its section 1385 discretion.

We need not address another contention withdrawn by appellant.[8]

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

---

[8]In his reply brief, appellant conceded reasons for consecutive *in*determinate sentences need not be stated.

### APPENDIX

"Ms. DIANE T.: Your Honor, the purpose of my statement to the court is to ask you to impose the maximum penalty that the law allows in the sentencing of Mark Bernard Rocha for the crimes for which he was convicted.

"On the night of September 6th, 1994, Mark's violent and brutal attacks upon me and my daughter [V]. almost cost us our lives. However, it is not thoughts or feelings of revenge or hatred that motivate me to speak to you today, rather it is the fear that what happened to me and to my child could happen to someone else.

"I have no doubt that our justice system must and does serve to protect our citizens and other residents from harm, but I am also aware that criminals sometimes slip through the cracks, so to speak, and repeat and repeat their anti-social behavior. I fear that this could happen with Mark and that next time his victims might not be as fortunate as we were. We survived, we did not die, and as damaged as we might still be, we do have a chance to rebuild our lives. The next victims may not be so lucky.

"I want to give you some information that was not presented at the trial, not presented because I would not allow my already traumatized five-year-old daughter to testify. [L.], who was five at the time of the assault, her actions that night probably saved my life and also that of my daughter [V.]. She awakened after [V.] and I were already rendered unconscious by Mark's vicious attack. She screamed and continued to do so, which alerted our neighbors who broke down my door, called 911, and set in motion the arrival of the paramedics and police officers.

"The reason [L.] kept on screaming, in spite of her terror, was that although her unconscious sister was lying in pools of her blood with her jaw, cheekbones and skull fractured, her ear severed, my daughter [L.] saw Mark squatting over [V.]'s severely damaged body with a knife at her throat. The knife, although a threat to [L.] herself was more of a threat to [V.]. I am convinced beyond a shadow of a doubt that had [L.] not awakened when she did and had her blood-curdling screams not persisted, that Mark would have slit [V.]'s throat and then killed [L.] as well. We all would have died and Mark would never have been caught.

"Although we were so fortunate to survive, we have all been profoundly damaged. I am still ill with permanent brain injury; [V.] still has seizures; and we all, including [L.], had suffered immense psychological harm. [L.] still does not sleep through the night. Both my children are terrified of people and their innocence has—their innocence has been stripped from them. They will get better as will I with years of trauma therapy, but we will never get over what happened to us.

"My children are young, with long lives ahead of them, but lives that will forever bear the scars of this horrendous damage inflicted upon our family.

"I am a psychiatric geriatric social worker. I have worked full-time since the death of my husband three and a half years ago struggling and succeeding to both work, support, nuture and raise my children. I don't know when or if I'll be well enough to return to work and if my chosen profession will ever again be possible for me, as a social worker with permanent short-term memory loss is a poor job candidate. My disability insurance will be depleted in about six weeks and my savings are gone.

"Although I have my life, I have my children, I have lost all else. Financial security, financial stability, a sense of identity through my work, my view of life, I've lost most of my friends, I've lost a sense of safety and peace of mind. Like my children, I too will get better. But the pain I endure and will continue to do for some time is too often unbearable.

"Please, Your Honor, don't take a chance that this could happen again to someone else, that another child might be killed because the maximum sentence of incarceration for Mark was not imposed.

"Thank you."