Filed 3/7/13  P. v. Mains CA3

**NOT TO BE PUBLISHED**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C067590 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F03297) |
| v. | |
| DENNIS ROBERT MAINS, | |
| Defendant and Appellant. | |

A jury found defendant Dennis Robert Mains guilty of first degree murder, during which he personally used a gun.  It then found he was sane at the time of the crime.  The trial court sentenced him to state prison for the prescribed term.

Indisputably guilty of the act of homicide, defendant attempts to find reversible error in connection with his proffered defenses of provocation from the victim and his purportedly psychotic state of mind.  To this end, he challenges the trial court's refusal to instruct on mistake of fact stemming from medicinally induced hallucinations; its failure to instruct on the elements of second degree murder; its failure to allow consideration of

1

voluntary intoxication in connection with the subjective mental states involved in the elements of provocation or imperfect self-defense; and its refusal to admit evidence bolstering his testimony that he thought the victim was poisoning him and had behaved violently toward him. He also contends the trial court erred when it failed to grant a continuance after the prosecution provided a large amount of discovery on the eve of trial. We shall affirm the judgment.

## FACTUAL BACKGROUND

Defendant and the victim met in 1995. They were married three months later. It was a tempestuous relationship. The victim left defendant four times between 1998 and 2006, but each time they reunited.

Defendant testified that the victim had tried to stab him three times over the years (reporting one of these incidents to his daughter). He also asserted that the victim had tried to kill her previous husband with a gun. On the other hand, a friend had observed the victim with physical injuries on three occasions, which the victim attributed to defendant (a claim defendant denied at trial). The victim's brother had also noticed bruising on the victim, and warned defendant against doing anything like that to her again.

Both defendant and the victim obtained restraining orders against the other at different times. During one of their separations, defendant reported a violation of the restraining order against the victim to the police; he repeatedly said to the officer that he was afraid of the victim because she had previously threatened to kill him and could obtain a gun,[1] and he had learned someone was trying to locate him (even though he had not seen the victim in several months, who was in Arizona). Although unable to contact

---

[1] The victim's brother had helped her move during one of the periodic separations. He saw a gun among her possessions, which another sibling unloaded.

2

the victim, the responding officer filed a report pursuant to a city protocol with respect to restraining orders.

Defendant testified that the victim was verbally abusive, and he shared with his daughter his belief in the victim's ongoing infidelity. He also testified that between 2005 and 2008, he had awakened four times to find the victim was spraying him with an arachnicide, and he once caught her pouring something from a small bottle into his milk container. He had told "seventeen different people" about the poisonings, including his daughter. Defendant sought hospitalization a dozen or so times for various physical and mental problems in the years preceding the murder. In his view, these were a result of the dosings with the arachnicide. His ailments included a "nervous breakdown," paranoia, hallucinations, panic, nausea, vomiting, headaches, and profuse sweating. However, he never told anyone at a hospital about the poisonings because he would be rendered homeless if the victim were arrested. He also testified that he had tried several times to kill himself. At trial, he said his present medications mostly abated the hallucinations, but it was hard for him to focus.

A doctor testified that she had treated defendant during a hospital stay for sedative withdrawal in April 2007, when he appeared confused, agitated, anxious, and short-breathed, and reported chest pains and hallucinations. His stay was a week long. She prescribed an antipsychotic, though strictly as an additional sedative—she did not believe defendant's claims of hallucinations.

An emergency room (ER) doctor testified that he had twice treated defendant, in April and December of 2007. Defendant reported his belief in the first ER visit that a catheter had not been removed from his arm after a previous hospital visit, and asserted that he was having hallucinations. Defendant also claimed to have a history of schizophrenia. On the second occasion, defendant reported having chest pains (along with other physical ailments). The ER doctor did not find any foreign body present

3

during the first visit, and all cardiac tests appeared normal on the second. At the time, defendant had prescriptions for a sedative and a high blood pressure medication. A sedative overdose could lead to lethargy and confusion, but the doctor had not seen any signs of this. Sedative withdrawal could have led to the symptoms defendant reported on the second occasion.

In 2006, the victim and defendant had moved into a studio behind a house that the victim's daughter was renting. In March 2008, the victim filed for divorce, and intended to move elsewhere with her daughter. The daughter testified defendant refused to execute the dissolution agreement unless he was paid $5,000; the daughter paid him $3,000 and he signed the documents. However, he did not move out as he had promised to do. Defendant explained at trial that he had signed the documents only under threat of being put out on the street, ill and without any assets. Defendant then bought a gun with some of the money he had received. He testified that he needed it because he was in fear of the victim's family, who had been threatening him. (In his interview with the police, however, he had claimed he bought it for purposes of suicide.)

In April 2008, after inpatient treatment for mental health issues (apparently after a suicide attempt), defendant was referred to a halfway house clinic called T-Corps to help him transition to outpatient treatment for his depression. A physician's assistant (PA) specializing in psychiatry who worked there testified that only a person with a severe mental health problem would be referred to T-Corps. The PA met with defendant on April 22. The PA diagnosed defendant as having severe recurrent depression with psychotic features, and generalized anxiety disorder. The PA based this on defendant's report of episodes of depression and anxiety over the years, arising out of his difficulty with relationships (having been married six times) and his vague claims of auditory hallucinations over the past 18 months (which is actually a symptom more characteristic of schizophrenics who experience an onset of their disorder as young adults). Defendant

4

appeared properly oriented to reality during the evaluation.  Defendant also told the PA that he was afraid of the victim's family, who were dangerous people who might hurt him.  Defendant again did not say anything at T-Corps about the victim poisoning him.  Defendant seemed overwhelmed with grief over the loss of his marriage and his home.  The PA changed the type of sedative prescribed for defendant, because defendant did not feel it was working and patients develop a tolerance for sedatives.  Side effects of the new sedative could include a lowering of inhibitions, a paradoxical increase in anxiety, and drowsiness.  However, hallucinations or psychosis are not listed among the typical adverse reactions from use of the drug (as opposed to an abrupt withdrawal from its use).  The prescription limited defendant to two milligrams once per day for the first three days, then twice a day thereafter.  Defendant mentioned having a history of abusing sedatives over the previous 15 years.

Defendant began taking the new sedative the next day.  He took twice as much as prescribed.  At trial, he asserted that the medication made it hard to control his emotions and made him feel aggressive.  He also began to experience hallucinations.

Defendant visited a longtime friend on April 24.  The friend testified defendant was distraught about the divorce; he complained about the victim being physically and verbally abusive, and may have mentioned his belief that she had been poisoning him.  He also shared his fears about her family menacing him.  Defendant said he was upset that the victim would be living in a nice house while he would be near homeless.  Defendant made vague allusions to having hallucinations.

A T-Corps mental health worker assisting in defendant's case management met with him later that day to discuss housing.  The T-Corps worker had done intake work with defendant in early April, and had been present during the PA's evaluation of him two days earlier.  Defendant's mood seemed to have improved, and defendant told him that the new medication made him feel better without upsetting his stomach.

At trial, defendant said he had taken two more of the sedatives on April 24 and had been feeling okay during the day when visiting with his friend (and presumably during his meeting with the T-Corps worker), but his hallucinations got worse that evening. He thought the victim looked like a black blob, and then a frog, sitting on the bed.

The following morning, the hallucinations were worse and defendant felt shaky. Objects appeared to be melting and flying through the air; the floor rose, and a tuba appeared (playing visible musical notes). Defendant heard a deep voice saying, "break the curse." He had been hearing this phrase for a couple of months, and believed it was referring to the need for him to die.[2] He nonetheless took another sedative.

Defendant and the victim began to argue. She had learned defendant was responsible for reporting her out-of-town son to a local police department as a danger to himself or others, which resulted in the revocation of her son's parole and his return to prison for another 12 years. The victim was furious, and said she and her family would kill both defendant and his daughter.

Defendant left for the store to allow the victim to cool off, but returned because he had forgotten his wallet. The argument resumed, and he took another sedative at some point. The victim went into another room and came back with a knife, charging at him. Defendant fled for the store.

On his return, defendant first looked in through the window to determine if the victim was near the door with a knife. As a part of his hallucination, the surroundings suddenly went dark. He heard the victim shouting that she was going to kill him. She

---

[2] In his police interview, defendant had said he interpreted the phrase as referring to the victim. At trial, he explained this was one of the lies he told in order to "[get] a needle in [his] arm and . . . put [him] to sleep" because he wanted to die.

was lying awake in the bed. Defendant went into the bathroom, which suddenly lightened. He grabbed his gun and went back into the other room, which was still pitch dark in his hallucination. The voice resumed its chant of "break the curse," though these references to his need to die did not make sense to him. He saw trees on fire "on the left-hand side." The victim was now asleep. Her face began to glow in the darkness. Defendant turned around to put the gun back in the bathroom. He heard a growl. When he turned back, there was a black wolf bleeding from its mouth in the bed. As this was an embodiment of evil, he was going to shoot it. However, he paused when it turned into a lamb. The vision toggled again between wolf and lamb. When it turned back into the wolf for the third time, defendant fired the gun twice at it because "the evil of the wolf was going to kill [him]," which was the evil in his wife that had behaved badly toward him and desired his death for what he had done to her son and for other reasons. He was aware that he was shooting at his wife and not a wolf. At that point, he grasped that he was in the midst of a hallucination and "woke up staring at the wall"; when he saw his wife, he became conscious of what he had done and "went into hysterics."

Defendant testified that he took 170 of his blood pressure pills and 22 of his sedatives to kill himself. He left a suicide note for his daughter in which he expressed his anger about being left on the street, sick and alone. He called his friend to tell him what he had done, and warned the friend not to call the police or he would shoot himself. After defendant hung up, the friend nonetheless called the police. In the meantime, defendant called 911 to report that he was committing suicide after having shot his wife. He mentioned he and his wife had been in an argument, which had been building over the last week about her divorcing him and forcing him onto the streets, and he was frustrated.

The victim was shot twice in the head. Although she still showed signs of life when police arrived, she died during the administration of first aid.

7

An officer sat with defendant at the hospital. Defendant did not complain of any auditory or visual hallucinations, or state that he was suffering the effects of poisoning. He did not appear unresponsive to his surroundings.

The ER doctor who evaluated defendant for a medical clearance before release into police custody did not find any signs of a drug overdose. Defendant's vital signs, including his blood pressure, were normal. As a precaution, the doctor ordered charcoal therapy (which defendant refused to swallow voluntarily). The doctor had treated defendant twice before in 2007 for claims of chest pain, which the doctor thought might be attributable to sedative withdrawal. Defendant did not on either occasion complain of hallucinations. While the doctor believed that an overdose of the sedative could cause some people to hallucinate, he did not observe defendant manifest any signs of psychosis during the latter's six hours at the hospital. Defendant also did not say anything about being poisoned.

After his release from the hospital that afternoon, defendant agreed to a police interview after an explanation of his rights. Defendant appeared to be coherent, and acknowledged at trial that he was lucid during the interview. He again did not mention anything about being poisoned, or the assault with the knife before the murder, or the wolf/lamb hallucinations about which he testified at trial.[3] He did talk generally about having an 18-month history of auditory hallucinations (hearing radio stations and the curse-ending voice, which he told the police had also been urging him "to do it"), visual hallucinations (moving objects, colors) and his nervous breakdown. He explained to the police that he had not told anyone else about the voices because he did not want to be

---

[3] At trial, defendant explained he omitted the former details because he felt suicidal and indifferent to the outcome of the investigation, declaring that he did not want to drag his wife "through the mud" as a result. As for the latter, he did not think the interviewer would believe him.

committed. In response to defendant's claim of being psychotic, the police interviewer told defendant he did not behave like the psychotic people the interviewer had questioned over the years.

Defendant discussed the abusive behavior of his wife and her family toward him, including his coerced agreement to a divorce under the duress of his straitened financial circumstances and illness, and her unfaithfulness. His police account did not include the antecedent argument about the victim's son or mention the victim's knife-brandishing. Defendant simply asserted that he had heard the voices that morning, and shot her while she slept because he could not fight them off any longer. When asked why he would say hateful things about the victim in the suicide note, defendant said she did not care if he was left on the street after the divorce (where he knew he would die), and acknowledged being angry at her for not returning his affections and forcing him to move into a boarding house. He said that he had not told the T-Corps worker on the previous day about voices wanting him to kill his wife because he did not want to be "taken in" and thought he could handle his condition on his own. Although the record is unclear on this precise point, an officer testified that defendant had some sort of seizure that required medical attention after the conclusion of the interview.

Another longtime friend (who is a criminal defense attorney) went to the jail to visit defendant about a week after his arrest (at which point defendant was apparently in the psychiatric unit). The friend testified defendant seemed depressed and ill at ease at his presence. He recalled that defendant had mentioned something about seeing a wolf face on the victim.[4] Defendant could not remember at trial what they had talked about.

---

[4] Contrary to the account of this testimony in defendant's briefing on appeal, the attorney did *not* testify that defendant told him "he had only fired his gun because he . . . saw a wolf." The exact snippets of testimony are "He did say something about, um, seeing a face, a wolf face or something like that" and "he was talking about seeing a wolf face on her," without any reference to this being the cause of the shooting.

Indeed, he asserted that he had not told anybody about seeing the wolf because it was not "necessary."

Defendant's daughter testified that defendant, who had been in the jewelry business, told her he had inhaled a great deal of jewelry cleaner, which caused him "to think funny things." She recalled him telling her about the victim's trying to stab him, and complaining about the victim's infidelities. She thought he was a teller of absurd tales to which she generally paid little attention, such as his belief in time travel. He had lived with her for a period of time before she moved; she told him he could not come with her, at which point he returned to live with the victim. She described him as someone who preferred living with someone else to take care of him rather than get a job.

A forensic psychologist conducted an evaluation of defendant in February 2009. He found defendant's account of the shooting to be "fantastic," because it was not consistent with the manner in which a person genuinely in the throes of psychosis or hallucinations would describe them. In the first place, visual hallucinations are "quite rare." What defendant described was more in line with the "vivid" and "movie-like' visions that psychedelic drugs induce. His description of auditory hallucinations was also unlike the way true psychotics experience them, because they hear familiar voices that are an indistinguishable part of their reality. The witness did not believe defendant had a mental disorder; instead, that he suffered from three types of personality disorders: histrionic (displaying theatrically dramatic emotions), narcissistic, and borderline (i.e., unstable, impulsive, prone to making decisions on the basis of emotion rather than reason, and given to emotional extremes that include episodes of depression). These personality disorders might cause defendant to misperceive reality in ways to gratify his own needs or feed his self-esteem, but they do not give rise to hallucinations. Defendant's present account of the shooting was simply a "dramatic and theatrical expression of emotion" as an exercise in self-justification for acting on an impulse out of

anger and resentment in response to the deprivations that the victim was exacting from him.  It did not matter that defendant had a history of reporting hallucinations, because none of them were genuine; they were a function of his histrionic character.  Although admitting he was not an expert, the forensic psychologist was familiar with the effects of psychotropic medications and did not think defendant's sedative could result in hallucinations.

## DISCUSSION

### I.  Refusal to Instruct on Mistake of Fact from Involuntary Intoxication

Defense counsel sought an instruction on mistake of fact negating defendant's intent to kill based on his claim of seeing a wolf at the time of the murder.  Counsel asserted this hallucination was a function both of defendant's new sedative and the effects of the victim's purported poisonings.  Counsel further contended this was involuntary intoxication because defendant was not aware there would be a hallucinatory side effect from taking the sedative.  (*People v. Scott* (1983) 146 Cal.App.3d 823, 831-832; see also our decision in *People v. Raszler* (1985) 169 Cal.App.3d 1160, 1165 & fn. 2 [discussing extremely narrow scope of holding as limited to delusional mistake of fact arising from involuntary intoxication].)  The trial court refused to instruct on the effect of involuntary intoxication on a required intent or mental state, and further ruled that defendant's voluntary ingestion of an overdose of the new sedative precluded him from claiming a mistake of fact (also noting the absence of any evidence other than defendant's own testimony that the sedative could in fact have this effect).  The court did agree to instruct that a hallucination could negate premeditation or raise a reasonable doubt about its presence.

On appeal, defendant argues there was evidence from which a jury could have concluded that he suffered involuntary intoxication resulting in the wolf hallucination because there was a change to a new medication, the possible hallucinatory side effects of

11

which he was not aware.  Defendant *claims* he testified that "he mistakenly believed he was shooting a wolf because he was hallucinating" and thought it was attacking him.  The record, however, is to the contrary.

As we noted above, the PA testified that hallucinations are a potential result of *withdrawal* from the sedative, *not* from its use or abuse (as defendant incorrectly asserts repeatedly in his briefing).  Although the ER doctor who evaluated defendant after the murder thought hallucinations were possible from an overdose, he did not observe defendant manifesting any signs that he was in fact hallucinating.  This leaves only defendant's self-serving account of experiencing hallucinations, which the only psychiatric expert testifying at trial discredited as being inconsistent with authentic accounts of visual hallucinations.  This is hardly substantial evidence of a hallucinated mistake of fact.

In addition, defendant's decision to continue taking more of the sedative despite the visual hallucinations that he claimed began *after* he started using the new medication belies his assertion that his intoxication was involuntary, because continuing to take the sedative under these asserted circumstances was not a reasonable course of conduct. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1324-1328 [ignorance of potential side effects must be reasonable]; *People v. Velez* (1985) 175 Cal.App.3d 785, 794-795 [unreasonable conduct precludes claim of involuntary intoxication].)

Moreover, defendant *never* testified that he feared an *attack* at the time of the murder from the wolf in the bed.  Nor did he think he was shooting *only* at a wolf; he testified his wife's evil behavior toward him was *embodied* as a wolf, but he was nonetheless aware that the wolf was still his wife.[5]

---

[5] Defense counsel recognized this in an exchange with the trial court on the subject of provocation for self-defense:  "[Defendant] testified that the threats to kill, the knife, the poisoning, all of it, when he shot the wolf, her personified as evil, all of that went through

12

In any event, the jury necessarily resolved the issue against him. As noted, the court instructed the jurors, "You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first degree murder." As the jury found defendant guilty of *first* degree murder, it necessarily rejected his fantastic account of the shooting. Contrary to defendant's assertion, this instruction thus in fact "permitted the jury to give voice to a finding of hallucination," even if he does not care for the answer.

## II. Failure to Define Second Degree Murder Separately

In addition to hallucinations, the court also instructed the jury that defendant's voluntary intoxication could preclude him from premeditating and deliberating the murder (or intending to kill), and a "mental disorder" could raise a reasonable doubt that he acted with malice or with premeditation and deliberation. Defendant points out that the instructions did not also expressly define second degree murder as being a homicide committed with malice but without premeditation or deliberation, and thus the trial court failed to instruct on the elements of that lesser offense, or at least include an instruction to the effect that all murders other than first degree murder are of the second degree. He contends this requires reversal because the jury would believe its alternatives were only first degree murder or acquittal.

---

his mind, um, plus the things that had happened in the past. . . . That's what was going through his mind when he shot her, the wolf, as evil." When the court asked if defendant had testified that he shot a wolf, not his wife, defense counsel asserted, "[Defendant] didn't state that. What he testified to was that he shot the wolf, which was evil, which is her. He testified they were one in the same, so therefore he is not just shooting a wolf, he is shooting her [as] personified as a wolf."

The court, however, instructed the jury on the elements of murder and—if it found defendant committed murder—the need to determine whether it was of the first or second degree. It then defined first degree murder as requiring premeditation and deliberation, with the People having the burden to establish that the murder was of the first degree. The court further instructed that provocation could reduce a first degree murder to one of the second degree, or even voluntary manslaughter (along with the previously mentioned instructions regarding the effect of hallucinations, voluntary intoxication, and mental disorder on the various mental states at issue). Finally, the court included a verdict form for second degree murder and instructed the jury on the manner in which it could return its verdict, requiring a finding of not guilty on each greater offense before returning verdicts on each lesser offense.

We must determine whether it is reasonably likely that the lacuna defendant posits would have led a reasonable juror astray (*Boyde v. California* (1990) 494 U.S. 370, 378, 380 [108 L.Ed.2d 316, 327, 329]; *People v. Cross* (2008) 45 Cal.4th 58, 67-68), and assume that the jurors are capable of correlating the instructions as a whole (*People v. White* (1987) 188 Cal.App.3d 1128, 1138-1139). While the instructions indeed failed to define *positively* the elements of second degree murder, the clear import of the instructions as a whole is a definition in the negative: If the jury found defendant committed murder (an intentional killing with malice), but there was reasonable doubt of premeditation, then it must be a murder of the second degree because that was the next step in the directions for returning the verdict after acquitting defendant of first degree murder. We thus do not discern any possibility of prejudice from the lack of a definition of second degree murder.

### III. Heat of Passion/Unreasonable Belief in Need for Self-defense

Defendant next asserts the instruction allowing the jury to consider the effect of his voluntary intoxication on the presence of an intent to kill or premeditation erred in limiting it to those two issues. He argues either defense counsel (or the trial court sua

14

sponte) should have also included a provision allowing the jury to take his voluntary intoxication into account in determining whether he was subjectively provoked into acting in a heat of passion, or subjectively believed in the need to employ deadly force in self-defense.**6** (*People v. Cameron* (1994) 30 Cal.App.4th 591, 601.)

In order to be entitled to an instruction on the lesser offense of voluntary manslaughter as a result of a sudden quarrel or heat of passion, there must be evidence that a defendant's reason *was* clouded as the result of a strong passion, the cause of which was provocation sufficient to arouse an intense emotion *other than revenge* in a *reasonable* person that overcomes the ability to act on the basis of reason and due deliberation. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253; *People v. Lee* (1999) 20 Cal.4th 47, 59-60; *People v. Breverman* (1998) 19 Cal.4th 142, 163; *People v. Valentine* (1946) 28 Cal.2d 121, 139.) Even where reasonable provocation is present, its mitigation of an intentional homicide can be negated if there is an appreciable interval in which to regain control before taking fatal action. (*People v. Moye* (2009) 47 Cal.4th 537, 550, 551-552.) The alternative form of voluntary manslaughter that results from acting unreasonably in self-defense also has a temporal component, in that it must be in response to a perceived imminent peril requiring *instant* action, this limitation being a function of the paramount value society places on human life. (*In re Christian S.* (1994) 7 Cal.4th 768, 783; *People v. Rivera* (2011) 201 Cal.App.4th 353, 357, 365 [revelation that victim may have infected defendant with AIDS insufficiently imminent peril].)

---

**6** We disregard a stray reference to true self-defense under this heading, which is not supported with any further argument, authority, or analysis of prejudice. (*Sourcecorp, Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061, fn. 7; *Quail Lakes Owners Assn. v. Kozina* (2012) 204 Cal.App.4th 1132, 1137.)

15

The facts do not support an instruction under either of these theories (regardless of the trial court's willingness to instruct on them).[7]  As a result, the failure to allow jury consideration of his voluntary intoxication in connection with them is immaterial.

*Reasonable* provocation for heat of passion is entirely absent:  Both the victim's death threats and her brandishing of the knife to which defendant attested occurred before he *went off to the store and chose to return*, which are circumstances inconsistent with maintaining a state of heat of passion.  Defendant also did not testify that he was *actually* in any state of provocation when he entered the studio and found his wife lying in bed, or when he came out of the bathroom with the gun and watched her sleeping on the bed.  As for his claim of acting unreasonably in self-defense, he did not identify any *imminent* peril to which he was responding at the time he shot the *sleeping* victim, only his fear *and anger* at her past evil conduct toward him generally and that morning.  Furthermore, as with his purported hallucinations, the jury's verdict of first degree murder necessarily rejected there being any mitigating effect from his voluntary intoxication on the presence of intent to kill or premeditation, and thus the failure to direct the jury to take it into account in connection with the subjective elements of voluntary manslaughter is immaterial.  We therefore find he could not possibly be prejudiced as a result.

### IV.  Exclusion of Corroborative Evidence

Defendant identifies three areas that the trial court precluded him from pursuing.  These include (1) an offer of proof that he had significantly elevated amounts of antimony in his hair at the time of his arrest (which abated thereafter), and that the symptoms he was reporting before the murder were consistent with antimony poisoning;

---

[7]  Contrary to defendant's belief, the windfall of an unwarranted instruction on a lesser offense does not tie our hands.  (Cf. *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834 [observing that arguably unwarranted instruction on true self-defense did not give rise to duty to instruct on unreasonable self-defense].)

(2) his daughter's testimony that before the murder he told her of his suspicions of being poisoned (to which she did not give credence); and (3) testimony from Arizona friends whom he told before the murder about his poisoning suspicions (to which they apparently did not give credence, either) and his fear of allowing the victim to obtain a gun.

The court found the absence of *any* foundation connecting the presence of antimony in defendant's hair with an effect on his mental state, or with the claimed arachnicide sprayings (including the absence of any evidence of the active ingredients of the spray) as opposed to some other source for it,[8] and thus excluded the evidence. The court sustained an objection to the daughter's testimony about defendant's poisoning suspicions; and allowed defendant to call one or the other of his friends to testify about defendant telling them that the victim menaced him with a knife, but excluded the remainder of their testimony as irrelevant. (Defendant never called either of the friends as a witness.)

Defendant argues it was prejudicially erroneous to exclude this evidence, because it corroborated his testimony that he had a genuine belief antedating the murder that the victim had been poisoning him, and was also in fear of her. He claims this was essential to his theory of unreasonable self-defense, and as a result the exclusion of the evidence was a violation of both state and federal law.

As defendant failed to provide *any* connection between the presence of antimony in his hair and a mechanism by which *the victim* could have exposed him to it (as opposed to some source other than the victim)—most importantly, that it is even an ingredient in the spider spray—the evidence did not provide any rational basis for the jury to infer any corroboration of the poisoning claims of defendant, and thus the trial

---

[8] Defense counsel had earlier asked defendant about antimony. Defendant testified he was not familiar with the element, and was not aware of ever ingesting or handling it.

17

court properly excluded it on that basis. (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 44-45; *People v. Berti* (1960) 178 Cal.App.2d 872, 876.) The lack of any expert testimony about the effect of antimony on mental functioning also was a proper basis for excluding the hair evidence in connection with defendant's mental state at the time of the murder.

Except to the extent they might rebut any claim of recent fabrication, defendant's hearsay statements to his daughter and friends regarding suspicions of poisoning were of minimal corroborative value at best, given that they did not accord his statements any credence. As for rebutting any inference of recent fabrication, their testimony in fact could equally give rise to the opposite inference, that defendant's testimony was simply part and parcel of a *history* of making unfounded accusations against the victim. That said, the testimony of his friend about their conversation on the day before the murder demonstrated to some extent that the purported poisonings were not merely a post hoc rationale.

The proposed testimony about defendant's fear of the victim's obtaining a gun would have been cumulative of the brother's testimony that the victim *was* found in possession of a gun on a previous occasion, and of the officer's testimony that defendant seemed genuinely in fear of the victim coming after him with a gun when reporting a violation of the restraining order against her. In addition, his daughter did testify that he had told her of at least one incident in which the victim tried to stab him, which would corroborate his claimed fear as well (as would the testimony he chose not to adduce from one of the two Arizona friends).

We thus conclude that none of this evidence was essential to the theory of the defense such that its erroneous exclusion must be harmless beyond a reasonable doubt. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.) We also are of the opinion that it is not reasonably probable that admission of this evidence would have resulted in a more

18

favorable outcome to defendant. As we have found in his previous argument, the absence of any imminent peril or a reasonably contemporaneous provocation make any evidence of his subjective state of mind beside the point. As a result, we therefore do not need to decide the underlying question of whether the trial court abused its discretion in excluding the evidence.

## V. Belated Discovery

In the midst of voir dire, the prosecutor disclosed additional discovery to defense counsel that she had received at lunchtime on Monday. Defense counsel stipulated that the delay was not attributable to any fault on the part of the prosecutor (who had not been aware of a new tack in the defense to which the material might be material). Defense counsel spent four hours reviewing it on Tuesday. At the scheduled start of trial on Wednesday, defense counsel moved for a continuance to the following Tuesday (a delay of two court days).

Defense counsel asserted there were "a ton of things that were not in the police report," including new unspecified medical providers to subpoena, unspecified names to review with her client to determine if they were potential witnesses, and a compact disc with unknown contents to review. She also asserted the need to make unspecified redactions in copies of the material. She claimed that it was possible the new material could change her opening statement in unspecified ways or her strategy for cross-examination of unspecified prosecution witnesses. The prosecutor noted that the material, even if not documented, had all been available to defense counsel and the material was known to defendant because it consisted of documents from his home and wallet, and the victim's computer.

The trial court was dismayed this situation arose 14 days after the case had been assigned to it for trial, and two years after the filing of the complaint. It remarked that it was not defendant's first request for a continuance, and reflected a pattern of delay.

19

When the trial court attempted to elicit from defense counsel the way in which the discovery was material, she said there were "things in there that may go to . . . how [defendant] was thinking at that time." The court denied the request for a continuance. Trial started later that morning. Defense counsel never further raised the issue of any prejudice from the delayed discovery.

Based entirely on the speculation that there was something in the late discovery that left trial counsel proceeding "without a full understanding of the . . . evidence in the case," defendant now contends that the denial of the continuance violated his right to effective assistance of counsel because it interfered with counsel's ability to prepare his defense, which entitles him to a reversal per se. He also argues that this was a surprise disclosure of inculpatory evidence, which violated his rights to due process and confrontation because he did not have a meaningful opportunity to prepare a defense as a result, and the error was not harmless beyond a reasonable doubt.

The cases defendant cites do not stand for the proposition that he is entitled to a reversal either per se or on the basis of prejudice *presumed* from *unspecified* evidence. (*United States v. Cronic* (1984) 466 U.S. 648, 649, 659-662 [80 L.Ed.2d 657, 661-662, 668-670] [limitation on amount of time to prepare for trial ordinarily requires demonstration of particular prejudice to establish violation of right to counsel]; (*Lindsey v. Smith* (11th Cir. 1987) 820 F.2d 1137, 1151-1152 [late disclosure of *specifically identified* inculpatory unrecorded confession; habeas relief denied in absence of *affirmative showing* earlier disclosure would have changed outcome of trial]; *U.S. v. Alvarez* (1st Cir. 1993) 987 F.2d 77, 85-86 [prejudice *affirmatively demonstrated* from failure to disclose *specifically identified* inculpatory evidence].)

In the present case, after defense counsel's apprehensive response to the late disclosure of discovery, the issue never arose again. It may be that her alarm turned out to be unwarranted; we cannot presume from unidentified evidence dehors the record for

20

purposes of direct appeal that defense counsel did *not* take any action necessary to represent her client effectively after the late disclosure. (*People v. Whalen* (Feb. 4, 2013, S054569) 56 Cal.4th ___, ___ [2013 Cal. Lexis 779 at pp. *129-*130] [defendant fails to satisfy burden as appellant to show belated discovery is either exculpatory or material when it is not part of appellate record]; *People v. Pope* (1979) 23 Cal.3d 412, 426 [cannot presume ineffective assistance of counsel based on matters outside the record].) We therefore reject this argument.

## VI. Cumulative Prejudice

Defendant contends he is entitled to a reversal on the basis of the cumulative effect of the errors he has identified. We have found his instructional claims either necessarily resolved against him or unwarranted on the evidence at trial; his challenges to the trial court's evidentiary rulings to be unwarranted or concerned only with cumulative evidence; and his challenge to the denial of a continuance to raise only speculative prejudice. As a result, he has failed to demonstrate a collective prejudicial effect that resulted in the denial of a fair trial. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

## DISPOSITION

The judgment is affirmed.

                                                     BUTZ                  , Acting P. J.

We concur:

        MURRAY               , J.

        DUARTE              , J.